No. 80,741

Jon F. Moran, M.D., *Appellant,* v. State of Kansas; The Kansas Board of Regents; The University of Kansas Medical Center; Daniel Hollander, M.D.; Glenn E. Potter; Kim Russel; A.L. Chapman; and Jon Jackson, *Appellees.*

(985 P.2d 127)

Opinion filed July 9, 1999.

*Christopher S. Shank,* of Shank, Laue & Hamilton, P.C., of Kansas City, Missouri, argued the cause, and *Brant M. Laue* and *Cindi S. Woolery,* of the same firm, were with him on the briefs for appellant.

*Susan R. Schrag,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *Bruce A. Ney,* of the same firm, was with her on the briefs for appellees.

The opinion of the court was delivered by

Allegrucci, J.: Jon F. Moran, M.D., former head of the Department of Cardiothoracic Surgery at the University of Kansas Medical Center (KUMC), brought this action against defendants, alleging that they made false and defamatory statements about him and his stewardship of KUMC's heart transplant program. Individual defendants are KUMC administrators. The district court granted summary judgment in favor of defendants on the ground that Moran had produced no evidence that he suffered damage to his reputation as a result of defendants' statements. Moran appealed from the entry of summary judgment. Defendants cross-

appealed on their claim of immunity under the Kansas Tort Claims Act (KTCA), K.S.A. 75-6101 *et seq.*, and on their contention that a defamation plaintiff must show a quantifiable pecuniary or economic loss or detriment. This appeal was transferred from the Court of Appeals pursuant to K.S.A. 20-3018(c).

Moran claims the district court erred in (1) finding he did not establish that his reputation was damaged by defendants' statements, and (2) requiring that he must show injury to his reputation when defendants have acted with actual malice. In their cross-appeal, defendants claim they are immune from liability under the discretionary function exception of the KTCA, and Moran is required to prove special damages or a quantifiable pecuniary or economic loss or detriment in order to make out a prima facie case for defamation.

Moran was chairman of the Department of Cardiothoracic Surgery at KUMC from June 1985 to April 1994. He remained on staff at KUMC until he resigned on March 3, 1995.

At issue are statements made by KUMC administrators in four communications in May 1995: (1) May 7—*Kansas City Star* newspaper published a lengthy article about the faltering heart transplant program at KUMC. KUMC administrators are quoted and cited. (2) May 10—an open letter from a KUMC administrator about the *Star* article and the heart transplant program was made generally available to the public by being posted on the Internet. It quoted in full a response prepared by two KUMC administrators to the May 7 *Star* article. (3) May 11—*Kansas City Star* published the KUMC administrators' response to the May 7 article as a Viewpoint commentary. (4) May 17—the Viewpoint commentary was posted on the Internet.

(1) The impact of the *Star*'s May 7 article lay in its pairing of the fact that no heart transplants had been performed at KUMC from early May 1994 to late March 1995 with the paradox that patients continued to be admitted and added to the heart transplant waiting list. In investigating the circumstances, the reporter talked to Moran and Dr. Clay Beggerly, the program's two former surgeons. The account that Moran gave the reporter was that he had complained for many months of a lack of surgeons and quali-

fied nurses. When the complaints produced no changes, Moran asked twice in early June 1994 that the program be suspended. His request was not granted. In early November, he told administrators that he would do no more heart transplants.

Jon Jackson, an associate administrator of KUMC, was quoted in the *Star's* article:

" 'There was not any indication given to us that he was not operating a program,' said Jon Jackson, an associate administrator. 'Had Dr. Moran told us that we're not going to do transplants prior to his letter of Nov. 4, we would have made other arrangements for those procedures to take place.' "

Kim Russel, chief operating officer, was quoted as denying Moran's allegations of shortages of qualified nurses.

(2) The May 10 open letter from A.L. Chapman, Acting Executive Vice Chancellor, began by quoting the entire response prepared by Daniel Hollander, Executive Dean, and Glenn Potter, Vice Chancellor for Hospital Administration, to the May 7 *Star* article. Chapman added several paragraphs, including the following one:

"It is important to point out that after Dr. Moran announced he would do no more transplants, Dr. Hannah and KU cardiologist Dr. Steven Gollub jointly accepted responsibility to accept or reject donor hearts. A review shows that none were turned down for other than medical reasons after November, 1994. To be acceptable, donor hearts must closely match tissue type and body size of the recipient as well as meet other clinical criteria."

(3) The Viewpoint commentary by Hollander and Potter placed responsibility for collapse of the heart transplant program squarely on Moran:

"For about 10 years, heart transplantation surgery was headed by Dr. Jon Moran. As the physician in charge, it was Dr. Moran who made medical decisions about his patients.

"It was Dr. Moran who decided which patients were put on a waiting list for a heart transplant, and which hearts to accept or reject. These medical decisions were made by Dr. Moran, not by hospital or medical center administrators.

"As shown by the date in the May 7 article, Dr. Moran on his own began to curtail the volume of heart transplant surgery in 1993. He did fewer transplants in 1993 and 1994 than he had in previous years.

"Although he continued to assign new patients to his waiting list, he began to refuse almost all hearts that were offered to him for transplantation, but did not

notify administration of this fact until November 1994. The hearts that were offered to Dr. Moran—but refused by him—were then offered to other national programs and were either accepted or declined by them. Finally, in November 1994, Dr. Moran formally announced that he would no longer do heart transplants.

"The May 7 article also alleged that there was a shortage of skilled nursing staff to care for cardiac patients. When Dr. Moran expressed concern about nurse staffing, a committee of faculty physicians and hospital representatives was appointed. Nursing issues were reviewed and addressed to the complete satisfaction of hospital administration."

(4) On May 17, the Viewpoint commentary was posted on the Internet.

For the purpose of their motion for summary judgment, defendants did not dispute that they made the statements Moran complains of, that the statements were false and defamatory, and that Moran had proven actual malice. For his part, Moran conceded that he is required to show actual malice.

In granting defendants' motion for summary judgment, the district court gave only one reason for its decision: "Based upon the record established by the parties and presented to the court in this motion the court can find no evidence that plaintiff suffered any damage to his reputation as a result of any statements made by any defendant."

We first consider whether Moran established that his reputation was damaged. The district court made findings of fact with regard to Moran's reputation:

"11. Plaintiff claims he was damaged because the frequency with which he has been approached about considering positions as division or department chief of an existing CTS (cardiothoracic surgery) program or to start a new CTS or heart transplant program or as a transplant surgeon in an existing transplant program, have decreased dramatically since the subject Statements. . . .

"12. Plaintiff claims he was damaged because the frequency with which he has been asked to write scholarly articles or to review articles submitted for publication in major national journals has decreased. . . .

"13. Plaintiff claims his reputation within the academic surgical community, as well as the community at large, and as a heart transplant surgeon has been damaged; . . .

"14. Plaintiff claims his ethical reputation has been damaged. . . .

"15. Plaintiff claims that his reputation for reliability in keeping academic medical matters out of the public view has been damaged. . . .

"16. Plaintiff is claiming that his reputation with insurance company executives has been impaired because they were sent summaries of the Subject Statements. He does not know what, if any action these unnamed executives took as a result of having seen the subject memos. He believes that, in the future, if he became involved with a heart transplant program and they applied to be a Center of Excellence with one of these institutions or if he applied to any third-party to do cardiothoracic surgery as a provider for an insurance company they might not want to list him as a provider any more. This speculation as to events that could take place in the future is based only on the memos themselves which plaintiff believes were sent to insurance company executives.

. . . .

"22. In his answers to defendants' interrogatories, plaintiff set forth a number of ways in which defendants' defamatory statements had harmed his reputation:

'While I am still able to practice as a cardiothoracic surgeon, my academic advancement has been markedly impaired by defendants' actions. Specifically, the frequency with which I have been approached about considering positions as division or department chief of an existing CTS program, or to start a new CTS (or heart transplant) program, or as a transplant surgeon in an existing transplant program, have decreased dramatically since the defendants' libelous communications. Similarly, the frequency with which I have been asked to write scholarly articles or to review articles submitted for publication in major journals has decreased. My reputation within the academic surgical community, as well as the community at large, has been damaged. This damage is significant and, I believe, is likely to be permanent.'

"23. Reverend Jennifer Malewski was the Protestant Staff Chaplain at KUMC. . . . At the time Dr. Moran left the Medical Center, Reverend Malewski had a good opinion of him as a physician and as someone that cared for his patients. After reading statements contained in the May 7, 1995 *Star* article, Reverend Malewski had concerns as to whether Dr. Moran was operating out of a 'hidden agenda' in turning down hearts, a concern she still has today. She further testified that she had read the May 11, 1995 letter to the editor [Viewpoint commentary] and the Open letter and that they had 'put[] [Dr. Moran] in a questionable light in my mind' and that the question in her mind was triggered by the three articles. Reverend Malewski further testified that the three articles '[j]ust left me up in the air about what to think. I don't know what to think.' Reverend Malewski's testimony was that the focus of her concern was the following 'bullet' statement which appeared in the May 7, 1995 article, p. A-20:

'Yet, the newspaper's examination found that during those 10 months:

'KU Medical Center refused hearts 50 times, including 38 times for nonmedical reasons. Twelve of those refusals were because the program was "too busy" or surgeons or nursing staff weren't available. An additional 26 refusals were for "administrative" or "other" reasons not explained in detail.'

The above statements concerning the number of hearts turned down was what led Rev. Malewski to wonder if Dr. Moran had a hidden agenda. The article in

its entirety was not what stuck with her, but it was the Star's statement of the number of hearts which had been turned down.

"Rev. Malewski testified that the second focus of her concern was Dr. Beggerly's quoted statement that he and Moran were in a 'nightmare situation of trying to run a program without adequate staff.' As is evident from the text of the article itself, neither the '50 hearts' bullet statement nor the Beggerly statement quoted above was made by or attributed to any of the defendants nor do such statements form the basis of plaintiff's lawsuit.

"If presently asked to do so, Rev. Malewski would herself recommend Dr. Moran to head up a heart transplant program. She would do so without any reservation or concern based on her firsthand experience and knowledge and without regard to what she had read in the subject articles. She does not base her personal opinions on things that appear in the newspaper.

"24. Dr. Susan Pingleton, a doctor on the KUMC staff, testified that in the professional capacity that she knew Dr. Moran, her opinion was that he 'had a very high standard of patient care and took care of patients well.' When asked whether her opinion of Dr. Moran changed after the publication of the May 11, 1997 letter, Dr. Pingleton replied that 'I think the letter would cause anybody who would read it to be concerned about Dr. Moran's practice. I mean it's not a very flattering letter.' When asked whether the letter raised any concerns with her, Dr. Pingleton replied 'Yes, I just said anybody would be concerned reading it.'

"Dr. Pingleton also said she had and *has* a high opinion of Dr. Moran as a clinician. Nothing that she read had altered her perception of Dr. Moran relative to her own interactions with him about pulmonary and intensive care medicine patients. The subject statements did not alter Dr. Pingleton's pattern of professional behavior vis a vis Dr. Moran nor is Dr. Pingleton aware of any one else whose pattern of professional behavior was altered."

On this record, the district court could "find no evidence that plaintiff suffered any damage to his reputation as a result of any statements made by any defendant." The court elaborated:

"All of plaintiff's testimony is couched in terms of what *he* believes he has suffered. Yet he can bring forward no one else who says that he has been approached less frequently about new employment positions, new transplant programs or authorizing or reviewing scholarly publications. Nor is there any evidence other than his own conjecture that he has been sued in medical malpractice cases or will be unable to obtain insurance in the future. Even if the court gives plaintiff the benefit of these facts based solely on plaintiff's opinion and finds that all of these things have occurred, there is still no evidence that any of defendants' statements caused these results. The record here contains other publications not attributable to defendants that contain information which one could construe as possibly damaging to plaintiff and, for that matter, to several other people involved

with Kansas University Medical Center. The jury would have nothing but speculation before it on the question of whether it was defendants' statements rather than those of others that caused any of plaintiff's alleged damages.

"Rev. Malewski, a chaplain at KUMC , testified that she had some concerns about plaintiff after reading the publications containing the alleged defamatory statements. In reading her testimony as a whole, however, it appears that her 'concerns' were the result of statements in the articles not made by any defendants. Add to that the fact that she would herself recommend plaintiff to head up a heart transplant program and her testimony fails to establish any damage to plaintiff's reputation as a result of defendants' statements.

"Plaintiff also relies on testimony by Dr. Pingleton, another doctor on the KUMC staff. She stated that one of the letters containing the defendants' statements would cause anyone to be concerned about plaintiff's practice and that it was not a very flattering letter. Yet she also stated that she had and *has* a high opinion of plaintiff as a clinician and nothing she has read has altered her perception of plaintiff relative to her own interactions with him about pulmonary and intensive care medicine patients. Nor did the statements in question alter her pattern of professional behavior vis a vis plaintiff nor is Dr. Pingleton aware of anyone else whose pattern of professional behavior was altered. This testimony simply does not indicate that plaintiff suffered a loss of reputation in the eyes of Dr. Pingleton or anyone else because of any statements of defendants.

"It's undisputed that plaintiff has the same job now that he had just prior to publication of the statements in question. He is a professor of surgery at East Carolina University School of Medicine. He also is chief of the pediatric cardiothoracic surgical program, director of the surgical assistants, and in charge of recruitment for the division of cardiothoracic surgery."

In considering a motion for summary judgment, a trial court is

"required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A defendant is entitled to summary judgment if the defendant can establish the absence of evidence necessary to support an essential element of the plaintiff's case. . . .

. . . .

". . . On appeal, we apply the same rules, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." *Saliba v. Union Pacific R. R. Co.*, 264 Kan. 128, 131-32, 955 P.2d 1189 (1998).

Quoting Prosser, Law of Torts § 111 (4th ed. 1971) at 739, the Court of Appeals has defined "defamation" as an act "which 'tends

to injure "reputation" in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him.' " *Gomez v. Hug*, 7 Kan. App. 2d 603, 611, 645 P.2d 916, *rev. denied* 231 Kan. 800 (1982). In *Gomez*, another test for the trial court was quoted from *Pedi Bares, Inc. v. First National Bank*, 223 Kan. 477, Syl. ¶ 2, 575 P.2d 507 (1978):

" 'It is only when it can be said that reasonable persons could reach but one conclusion from the same evidence that an issue may be decided as one of law. Summary judgment should never be granted merely because the court may believe movant will prevail if the action is tried on the merits.' " 7 Kan. App. 2d at 606.

In the trial court, Moran responded to the defendants' motion for summary judgment on the subject of evidence of harm to his professional reputation by stepping forward with his answers to interrogatories, Malewski's deposition testimony, and Pingleton's deposition testimony. The trial judge discounted Moran's answers to interrogatories as merely "his own conjecture" and "what *he* believes he has suffered." The trial judge noted that Moran's views were uncorroborated and that "there is still no evidence that any of defendants' statements caused these results." The trial judge discounted Malewski's testimony on the grounds that her good opinion of Moran remained intact and that any diminution there might have been of her good opinion of Moran was not produced by statements attributable to defendants. The judge discounted Pingleton's testimony on the ground that her esteem for Moran had not been diminished.

The evidence presented by Moran is unquestionably thin. However, when the evidence is viewed in a light most favorable to Moran and he is given the benefit of all inferences that reasonably may be drawn from it, a reasonable person might reach conclusions other than the one reached by the trial court.

Moran's beliefs, as expressed in his answers to interrogatories, do not amount to much by themselves. In order to amount to anything, the inferences Moran would have us draw must be reasonable. In the circumstances, a decrease after publication of defendants' statements for requests for Moran's professional partic-

ipation would seem to be the sort of detrimental consequence that might be expected from colleagues' defamatory statements about his professional conduct. Thus, it would be reasonable to infer a causal link between the decreased demand for his professional participation and the defendants' statements. The district judge treated Moran's answers to interrogatories as if Moran's own observations were unsuitable as proof of harm to his reputation. On this score, Moran cites *Ali v. Douglas Cable Communications*, 929 F. Supp. 1362, 1385 (D. Kan. 1996) (applying Kansas law), where the court found that summary judgment was inappropriate on a defamation claim:

"The plaintiff has testified to a former employee avoiding him after the alleged defamatory statements were made. The plaintiff posits that [the operations manager] upheld his termination based on the defamatory statements made by [the director of operations] and that he has been unable to find other employment because of the same. The court finds the evidence sufficient at this juncture to avoid summary judgment."

At best, the plaintiff's evidence in *Ali* was less persuasive than the evidence presented by Moran. The evidence in *Ali* consisted of (1) the plaintiff's own account of a minor incident linked to defamatory statements only by timing, and (2) his own conjecture that his job loss and continued unemployment were linked to defamatory statements.

Malewski, contrary to the trial judge's observation, did not limit the source of her concerns about Moran's motives and practice to the bulleted statement in the May 7 *Star* article. She testified that she read, in addition to the May 7 article, the May 11 Viewpoint commentary and the open letter from Chapman. She testified that when Moran left KUMC in March 1995, she had a good opinion of him as a physician and as someone who cared for his patients. She further testified that the things she read a few months later put him "in a questionable light." The trial court noted that Malewski singled out the bulleted statement from the May 7 article about how many donor hearts were refused by KUMC. In addition, Malewski testified that she could not remember her contemporaneous response to the May 11 Viewpoint commentary, but after

re-reading it at her deposition she testified that it confirmed the central point of the May 7 article:

"I think probably maybe the one thing I could address for you is this—what is it, fourth paragraph, 'Although he continued to assign new patients to his waiting list, he began to refuse almost all hearts that were offered to him for transplantation but did not notify administration of this fact.' I think that piece reinforced that bullet piece that was in here (indicating), in this May the 7th article for me, and it was kind of like, oh, boy, that really was going on, that really was happening. It wasn't an exaggeration."

Thus, statements unquestionably made by defendants Hollander and Potter on behalf of KUMC convinced Malewski of the validity of statements in the *Star* article. It should be noted that the Malewski deposition testimony quoted here was not made a part of Moran's response to the defendants' motion for summary judgment. It was later presented to the trial judge as an attachment to Plaintiff's Motion to Alter the Judgment.

The other shortcoming the trial judge found in Malewski's testimony was her saying that she would recommend Moran to head up a heart transplant program. Her recommendation in this respect would, of course, be professionally meaningless because she is a cleric, not a medical person. The trial judge, though, credited her statement as a significant demonstration that her esteem for Moran had not been diminished by defendants' statements. It seems questionable whether the trial judge's view was a product of his resolving all facts and inferences in favor of Moran, as required.

From Pingleton's testimony about Moran's competence as a surgeon and the quality of his clinical skills, the district court concluded that Moran's reputation had not suffered. The district court failed to distinguish between Moran's reputation for surgical and clinical skills and his reputation as the administrative head of a heart transplant program.

The district court also seems to have put some weight on the stability of Moran's employment after publication of defendants' statements. When viewed in the light most favorable to Moran, however, evidence of his employment status probably would be irrelevant to the question of harm to his reputation. The defendants' statements concerned his administration of a heart trans-

plant program. Moran's subsequent employment was in pediatric cardiothoracic clinical practice.

We are of the opinion that, although weak, Moran's evidence, when viewed as required for this purpose, is sufficient to withstand defendants' motion for summary judgment.

Having determined that the district court erred in granting defendants' summary judgment, we do not reach the second issue raised of whether actual malice would relieve Moran of the burden of showing injury to reputation. However, we feel additional comment is required. Although the defendants deny actual malice, they chose not to deny malice for the sole purpose of their summary judgment motion. In so doing, they created the legal equivalent of "King's X." By not disputing malice as to their summary judgment motion, the district court was limited to granting or denying the defendants' motion for summary judgment. They did not risk the entry of summary judgment in favor of Moran, and thus on appeal, we are asked to decide an issue which is not controlling and would only be advisory. This court does not render advisory opinions. *Sheila A. v. Finney*, 253 Kan. 793, 861 P.2d 120 (1993).

Since we are remanding this case, it is necessary to consider defendants' cross-appeal. Defendants first claim immunity under the discretionary function exception of the KTCA. Interpretation of a statute is a question of law for which this court's review is unlimited. *Hamilton v. State Farm Fire & Cas. Co.*, 263 Kan. 875, 879, 953 P.2d 1027 (1998).

The KTCA establishes a general rule of liability:

"Subject to the limitations of this act, each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state." K.S.A. 75-6103(a).

K.S.A. 1998 Supp. 75-6104(e) identifies exceptions from liability:

"A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:

. . . .

(e) any claim based upon the exercise or performance . . . [of] a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved."

Defendants contend that under this discretionary function exception of the KTCA they are immune from liability on Moran's allegations. The trial judge expressed disbelief that a state employee who made false and defamatory statements would be statutorily shielded from liability.

Defendants argue that the trial court failed to consider whether their actions fell within the scope of the discretionary function exception. Their argument is correct in the sense that the district court's opinion assumed that the KUMC administrators would be expected, as part of their job responsibilities, to respond to the *Star* reporter's inquiries and prepare and distribute responses to the *Star* article. The district judge did not question whether their job descriptions included these acts but, instead, skipped to the malicious intent with which they acted. (Actual malice was conceded for the purpose of the motion for summary judgment.)

Defendants contend that there were no mandatory duties or even guidelines involved so that they were called upon to exercise judgment and discretion in formulating an institutional response to the media inquiries and public controversy surrounding suspension of KUMC's heart transplant program. Moran does not quarrel with this point. It seems open to question, however, whether the administrators' communication efforts to protect KUMC's reputation by blaming a former staff physician were among their job responsibilities, irrespective of the truth or falsity of the statements.

This unanswered question may be more akin to scope-of-employment inquiries than to the analyses in *Bolyard v. Kansas Dept. of SRS*, 259 Kan. 447, 912 P.2d 729 (1996) and *Nero v. Kansas State University*, 253 Kan. 567, 861 P.2d 768 (1993). In *Commerce Bank of St. Joseph v. State*, 251 Kan. 207, 215, 833 P.2d 996 (1992), the court stated:

"The liability of the State for an act of an employee depends not upon whether the injurious act of the employee was wilful and intentional or was unintentional, but upon whether the employee, when the employee did the wrong, was acting in the prosecution of the State's business and within the scope of the employee's authority, or had stepped aside from that business and done an individual wrong."

With regard to the reason given by the district court for not applying 75-6104(e), *i.e.*, the discretionary function exception does

not apply to willful or intentional acts, defendants cite *Lantz v. City of Lawrence*, 232 Kan. 492, 499, 657 P.2d 539 (1983). *Lantz* appears to stand for the principle that malice does not preclude applicability of the law enforcement exception in 75-6104. In *Lantz*, the district court entered summary judgment against the plaintiffs despite finding that city employees " 'wrongfully cut 63 of plaintiffs' trees' " while enforcing a weed abatement ordinance. 232 Kan. at 492-94. "The [district] court ruled the city was exempt from liability under the KTCA as the city employees' conduct fell under the 'enforcement of a law' exception contained in K.S.A. 1981 Supp. 75-6104(c)." 232 Kan. at 494. Noting that the words "tree" and "trees" do not appear in the weed abatement ordinance, this court concluded that a material issue of fact emerged concerning whether the city employees' cutting trees was within the purview of the city's weed abatement ordinance authorizing its removal of weeds. Because the case was being remanded for further consideration, this court considered an additional argument made by the plaintiffs. Based on K.S.A. 1981 Supp. 75-6105(c), they sought punitive damages for actual malice in the city employees' actions. As quoted in the court's opinion, 75-6104(c) provided:

" 'A governmental entity shall not be liable for punitive damages or for interest prior to judgment. An employee acting within the scope of the employee's employment shall not be liable for punitive damages or interest prior to judgment, except for any act or omission of an employee because of actual fraud or actual malice.' " 232 Kan. at 499.

This court concluded that *if* the statutory exception to liability were applicable, it immunized defendants from all damages irrespective of the existence of malice. 232 Kan. at 499.

Moran contends that the court's statement about immunization from punitive damages in *Lantz* was merely dicta, and, furthermore, it was overruled by *Hopkins v. State*, 237 Kan. 601, 702 P.2d 311 (1985). Hopkins lived in a mobile home that was damaged when law enforcement officers fired into it in order to flush out an intruder. The trial court found that the defendants were immune from liability under exceptions (c), (d), and/or (m) of the KTCA. 237 Kan. at 607. Under the version of 75-6104 then in effect, subsection (c) was the exception for enforcement of a law that was at

issue in *Lantz*, and subsection (d) was the discretionary function exception. Hopkins argued that defendants acted outside their statutory authority when they outrageously and recklessly demolished his home. This court concluded that the trial court improperly granted summary judgment for the defendants on the questions whether any of the KTCA exceptions applied or whether "the officers['] conduct was more than negligent, *i.e.*, malicious or wanton, and therefore outside the protection from liability." 237 Kan. at 612. Without citation, the court declared: "The exceptions to liability of a governmental entity or employee set out in 75-6104 are not without limitations. Only negligent or wrongful acts or omissions of employees are excepted from liability by 75-6104, while acts or omissions involving more than the lack of ordinary care and diligence are not." 237 Kan. at 611.

Since *Hopkins* was decided, the view expressed in that case has been reiterated. See, *e.g.*, *Burgess v. West*, 817 F. Supp. 1520, 1526 (D. Kan. 1993); *Taylor v. Reno County*, 242 Kan. 307, 309, 747 P.2d 100 (1987); *Beck v. Kansas Adult Authority*, 241 Kan. 13, 33, 735 P.2d 222 (1987).

Moran cites *Lindenman v. Umscheid*, 255 Kan. 610, 639, 875 P.2d 964 (1994), for the principle that "[t]he government has no power or grant of immunity under the KTCA to maliciously prosecute a citizen of the state." The district court's entry of summary judgment in favor of the Kansas Department of Health and Environment (KDHE) on the Lindenmans' claims of abuse of process and malicious prosecution claims was reversed. 255 Kan. at 639. In the latter claim, the Lindenmans, administrators of day care centers which had licenses suspended by KDHE, "alleged that after KDHE learned the Lindenmans had refused to stipulate to the accuracy of the first inspection or waive the right to appeal, it began proceedings to revoke the day care center's license, [and] that this action was malicious and lacking in probable cause." 255 Kan. at 613. Moran likens the alleged malicious prosecution in *Lindenman* to the KUMC defendants' maliciously defaming him. Although defendants assert that the *Lindenman* facts are "totally different and far afield from the factual situation of the instant case," they fail to indicate how that affects application of the dis-

cretionary exception. *Hopkins* and *Lindenman* are controlling on this issue. The issue argued and decided in *Lindenman* was whether the KDHE had discretion to violate a legal duty and thus avoid liability. This court ruled it could not. In the present case, defendants would not be granted immunity under K.S.A. 1998 Supp. 75-6104(e) for defamatory statements.

Before stating his views with regard to the dispositive issue, the trial judge briefly mentioned issues he did not believe to be grounds for summary judgment. Special damages were included in the latter category:

"I do not believe that the law in the state of Kansas is that the plaintiff has to come up with a quantifiable figure in order to prevail. I don't believe that. To me, I think the plaintiff's position is well taken that this is a little similar to a pain and suffering award. If the plaintiff can establish lost [*sic*] damages to reputation, . . . then the plaintiff doesn't have to quantify that or present evidence that would quantify it. Obviously, the plaintiff has not done so in this case, but I don't think that's required."

Defendants state that they are appealing from this "ruling." Although it is somewhat of a stretch to say the district court ruled on this issue, we will consider it due to the case being remanded for further consideration by the trial court.

It is the position of defendants that since defamation per se was abolished in this state, a plaintiff must prove a quantifiable pecuniary or economic loss or detriment in order to make out a prima facie case of defamation. They rely on the following passage from *Gobin v. Globe Publishing Co.*, 232 Kan. 1, 7, 649 P.2d 1239 (1982):

"[P]laintiff offered no evidence of harm to his reputation, no evidence of damage by reason of injury to his reputation, no proof of financial loss flowing therefrom. He cannot recover in a defamation action for mental anguish in the absence of proof of the principal injury with which a defamation action is concerned—injury to reputation."

And defendants quote the following explanation of the effect of this court's abolishing defamation per se:

"In *Polson v. Davis*, 895 F.2d 705 (10th Cir. 1990), the Tenth Circuit observed that *Gobin* had abolished the distinction between defamation per se and defamation per quod. *Id.* at 708. This statement must be understood in the context

of *Gobin*. Prior to *Gobin*, a plaintiff seeking recovery for defamation per quod was required to allege and prove special damages. *See Gomez v. Hug*, 7 Kan. App. 2d at 612, 645 P.2d 916. *Gobin* merely changed the previous rule that damages are presumed in defamation per se cases. It does not alter the requirement that special damages be shown in defamation per quod cases. *See Hartman v. Meredith Corp.*, 638 F. Supp. 1015, 1016 (D. Kan. 1986)." *Woodmont Corp. v. Rockwood Center Partnership*, 811 F. Supp. 1478, 1483 (D. Kan. 1993).

In the present case, defendants invoked Supreme Court Rule 118 (1998 Kan. Ct. R. Annot. 161), which requires a plaintiff to provide a written statement of monetary damages sought. Moran complied, stating that he seeks $250,000 for pain, suffering, and mental anguish; $1,500,000 for loss of time and income; and $1,500,000 for injury to professional reputation. Defendants would have this court classify all of these claims as special damages and require an economic expert's evidence that Moran actually suffered quantifiable economic detriment.

Defendants use the term "special damages" as if it signified something extraordinary; they talk about Moran's proving a "prima facie" case of defamation and "quantifiable" loss. This court has not squarely decided whether in Kansas any and all defamation plaintiffs must allege and prove actual damages rather than relying on the theory of presumed damages. Thus, the issue the defendants might be expected to raise is whether Moran, in the circumstances of the present suit, must prove actual damages. The arguments they make, however, assume that question and push for additional requirements of expert testimony and proof of specific dollar amounts.

With respect to the proof required, defendants take the position that Moran cannot make his case without expert testimony. The deadline for naming expert witnesses has come and gone. The KUMC defendants contend that Moran's only evidence of damage is his own unsupported speculation. Moran's case no doubt is weak with regard to evidence of damages and might benefit from testimony about medical salaries and economics, but nothing cited by defendants stands for the proposition that his case is over without it. The authorities cited by defendants for their contention that "special damages" must be "quantifiable monetary loss" are pre-*Gobin* Kansas cases and cases from other jurisdictions.

In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974), the United States Supreme Court ruled: "It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury." 418 U.S. at 349. *Gertz* changed the law in Kansas. Damages recoverable for defamation, whether per se or not, could no longer be presumed but must be proven. The issue raised by defendants in this cross-appeal is best answered by Justice Powell, speaking for the majority in *Gertz*:

"We need not define 'actual injury,' as trial courts have wide experience in framing appropriate jury instructions in tort actions. Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury." 418 U.S. at 349-50.

We find no merit in the issues raised by the cross-appeal.

The district court's order of summary judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

ABBOTT, J., not participating.

GARY W. RULON, J. , assigned.