No. 87,848

GARY L. HALL, *Appellant*, v. THE KANSAS FARM BUREAU and
KANSAS FARM BUREAU SERVICES, INC., *Appellees.*
(50 P.3d 495)

Opinion filed July 12, 2002.

*John J. Miller*, of Law Office of John J. Miller, P.C., of Kansas City, Missouri, argued the cause and was on the briefs for appellant.

*Edward L. Bailey*, of Cosgrove, Webb & Oman, of Topeka, argued the cause, and *Carol B. Bonebrake*, of the same firm, was with him on the brief for appellees.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Gary Hall appeals from the decision of the district court granting summary judgment in favor of Kansas Farm Bureau (Farm Bureau), a cooperative marketing association, and Kansas Farm Bureau Services, Inc. (Farm Bureau Services), a general corporation. Hall was removed as president of both Farm Bureau and Farm Bureau Services. He sued, alleging that his termination violated the Kansas Cooperative Marketing Act (KCMA), constituted retaliatory discharge, and breached an implied contract. He also alleged defamation resulting from statements made by defendant's general counsel and that Farm Bureau Services negligently failed to instruct him in acceptable conduct for his employment.

In its order granting summary judgment in favor of Farm Bureau and Farm Bureau Services, the district court made findings of fact. On appeal, Hall has not challenged the district court's findings. Determinations of fact which are not appealed from are final and conclusive. *Klose v. Wood Valley Racquet Club, Inc.*, 267 Kan. 164, 165, 975 P.2d 1218 (1999).

The district court made the following findings of fact:

"1. Plaintiff Gary Hall filed suit against Kansas Farm Bureau and Kansas Farm Bureau Services, Inc. on or about August 14, 2000, alleging: (1) wrongful termination as an officer, (2) wrongful termination of employment; (3) breach of implied contract; (4) defamation; and (5) negligence.

"2. The Farm Bureau was formed, in part, to strengthen, develop, and correlate the work of the County Farm Bureaus in their efforts to promote the development of the most profitable and permanent system of agriculture.

"3. The Farm Bureau was organized pursuant to the Kansas Cooperative Marketing Act, K.S.A. 17-1601 *et seq.*

"4. The thirteen member Board of Directors is elected by the voting delegates at the annual meeting.

"5. Three of the thirteen directors are elected 'at-large' with the recommendation that he or she be elected President, Vice-President, or State Chairman of the Farm Bureau Women by the Board of Directors.

"6. The Board of Directors is charged with electing officers immediately following the annual meeting.

"7. Officers who must be elected by the Board of Directors include: a President, a first Vice-President and a State Chairman of Kansas Farm Bureau Women. The board may also elect an Executive Vice-President, additional Vice-Presidents, a Secretary, a Treasurer, Assistant Secretaries, Assistant Treasurers, a General Counsel, and any other officers deemed necessary.

"8. The duties of the Board of Directors of Farm Bureau are as follows:
The Board of Directors shall be responsible for conducting the affairs of the organization. They shall develop, promote and supplement the state Program of Work adopted by the Voting Delegates. The Board shall have the responsibility to review and appraise the service activities and programs of the Association with sufficient regularity to assure that said programs contribute to the overall goals and objectives of the Association.

"9. The Affiliated Companies of the Farm Bureau include: KFB Services, Kansas Farm Bureau Life Insurance Company, Inc., Farm Bureau Mutual Insurance Company, KFB Insurance Company, Inc., FB Services Insurance Agency, Inc. and FB Capital Management of Kansas, Inc.

"10. The Affiliated Companies were organized as for-profit entities pursuant to the Kansas general corporation code.

"11. KFB Services is the organization that services Farm Bureau and the other Affiliated Companies and their employees and employs many of the executive officers for all Affiliated Companies.

"12. The corporate powers, business and property of KFB Services shall be exercised, conducted and controlled by the Board of Directors of KFB Services.

"13. Farm Bureau and each of the other Affiliated Companies pays KFB Services for their respective share of the expenses. Farm Bureau's contribution to KFB Services for such expense is two and one-half percent (2½%).

"14. Farm Bureau and KFB Services have a Board of Directors which elect their own officers every year 'out of their number.'

"15. Certain officers, including the president, are required to be a member of the Board of Directors in order to hold these elected positions.

"16. It was the custom of the Board of Directors of Farm Bureau and KFB Services to abide by the officer recommendations of the membership.

"17. The president of KFB Services must be a present member of the Board of Directors of KFB Services.

"18. The president of KFB Services is a full-time employee.

"19. The officers of KFB Services serve on a full-or part-time basis and receive a salary as determined by the Board of Directors.

"20. Gary Hall was elected to a Director-at-Large position in Farm Bureau and KFB Services in 1994, 1996 and 1998 by the voting delegates.

"21. In 1995, 1996, 1997 and 1998, Hall was elected to the office of President by the Boards of Directors of Farm Bureau and KFB Services.

"22. Everything relative to Hall's compensation came from KFB Services.

"23. The Board of Directors, not its members, voted Hall into office as President.

"24. Hall was terminated as President of Farm Bureau and its Affiliated Companies including KFB Services on August 17, 1999 by a vote of eleven in favor to one against with one member absent.

"25. Farm Bureau and KFB Services board member Dale Roberds stated that the issues which led to the Boards' decision to terminate Hall included the inability of Hall to work with management and staff and presenting his own legislative policy instead of the Farm Bureau policy.

"26. Farm Bureau and KFB Services board member Steve Baccus voted to terminate Hall because of the breakdown of relationships between Hall and the corporate officers and staff.

"27. Hall received a document which stated:

'Reasons for Removal of Gary Hall as President Presented at Board of Directors Meeting August 17, 1999

1. Inability to work with staff of the companies, as well as the President's Team and Company Managers.

2. Intentionally not following the directives of the Board of Directors. This occurred in several areas of the organization, but most notably in the Public Policy and Legislative areas.

3. Criticizing staff of the companies outside of State headquarters.

4. Totally disregarding lines of authority and responsibility in the companies at all levels. Attempting to operate the companies based upon his personal agenda, rather than direction of the Board of Directors.

5. Failure to timely pay accounts payable.

6. Overall general problems with the direction and moving the companies forward. Placing road blocks to progress of the companies.'

"28. Farm Bureau was organized pursuant to the Kansas Cooperative Marketing Act (KCMA).

"29. In contrast, the Affiliated Companies, including KFB Services, are for-profit entities organized pursuant to the Kansas general corporation code.

"30. The provisions of the general corporation code are applicable to associations organized under the KCMA except in cases of conflict or inconsistency. K.S.A. 17-1628; K.S.A. 17-6001(c).

"31. The KCMA provides one method for removal of a director or officer. An association member who presents charges in conjunction with a petition signed by ten percent of the members may request removal of a director or officer. K.S.A. 17-1614.

"32. The KCMA does not prohibit other methods of officer removal as found in the general corporation code. Since the general corporation code governs associations organized under the KCMA to the extent it is not in conflict or inconsistent with the KCMA, the additional and alternative methods of removal of an officer are also available. K.S.A. 17-1626; 17-1628; 17-6001(c).

"33. Under the general corporation code, K.S.A. 17-6302(b) states that:

'Officers shall be chosen in such manner and shall hold their offices for such terms as are prescribed by the bylaws or determined by the board of directors . . . Each officer shall hold office until such officer's successor is elected and qualified or until such officer's earlier resignation or removal.' (Emphasis added.)

"34. K.S.A. 17-6302(b) and the Farm Bureau Bylaws provide in Article VI, §
4 of the Bylaws, that the Board of Directors is responsible for conducting the
affairs of the organization.

"35. Hall owed $5,888.00 to KFB Services for unreimbursed expenses as of
August 17, 1999.

"36. Hall owed KFB Services $10,468.00 for unreimbursed expenses as of the
audit report date of October 4, 1999.

"37. KFB Services has a policy that all employees are at-will employees.

"38. No special damages were suffered by Hall due to the alleged defamatory
statement.

"39. The statement made at the 1999 annual meeting regarding a business and
employment matter was given to only those persons who had an interest or
duty in the subject matter of the statement.

"40. All persons who were not Farm Bureau Directors, District Administrators,
or County Presidents or voting delegates were asked to leave the room before
the statement was read to the voting delegates at the closed District Caucuses.

"41. Only the County Presidents, Farm Bureau President Baccus, General
Counsel Arthur, and attorney Ed Bailey were present when the statement was
read at the County President's meeting.

"42. The District Administrators are employees of Farm Bureau who deal on
a day-to-day basis with the County Presidents on Farm Bureau and county
farm bureau business and affairs, and are members of a county farm bureau.

"43. The county presidents are those elected officials who represent their
members in the Farm Bureau and on the local county farm bureau boards of
directors."

The relevant facts can be summarized as follows:

Farm Bureau is organized pursuant to the Kansas Cooperative
Marketing Act (KCMA), K.S.A. 17-1601 *et seq.* Farm Bureau is at
the top of an organizational chart that includes a number of affil-
iated companies that are organized as for-profit corporations,
which are domiciled in Kansas and which include Farm Bureau
Services. Farm Bureau owns 100% of the voting stock in Farm
Bureau Services. Farm Bureau and the affiliated companies pay
proportionate shares of Farm Bureau Services' expenses.

Principal officers of Farm Bureau and Farm Bureau Services are
elected from the boards of directors by the boards of directors.
Hall was elected president in 1995. The president of Farm Bureau
Services is a full-time employee.

Hall was terminated as president on August 17, 1999. He was
given six written reasons for his removal. Most involved deficien-

cies in his management, especially inability to work with management and staff. One reason was his "[f]ailure to timely pay accounts payable."

Terry Arthur, who is general counsel for Farm Bureau and Farm Bureau Services, elaborated on the accounts-payable reason at the Farm Bureau annual meeting in November 1999. He told a select group of members that between January 1, 1996, and August 17, 1999, Hall received checks for reimbursement of expenses from Farm Bureau's affiliated companies. Arthur further stated that an audit revealed that as of August 17, 1999, Gary Hall had received $10,467 but had not reimbursed Farm Bureau Services even though that company had paid those travel expenses.

Arthur's statement was inaccurate in that Hall actually owed $5,888 to Farm Bureau Services as of August 17, 1999, and, as of the audit report date of October 4, 1999, he owed $10,467.

Hall first argues that the district court erred in granting summary judgment in favor of defendants on Hall's claim that his termination as president of Farm Bureau violated the KCMA. The district court concluded that K.S.A. 17-1614, which provides for removal of an officer of an association organized under the KCMA, was not contrary to or inconsistent with its counterpart in the general corporation code and, therefore, not an exclusive remedy. The district court concluded that Hall's removal as president of Farm Bureau was proper.

The district court found that Hall was terminated as president of Farm Bureau and its affiliated companies, including Farm Bureau Services, on August 17, 1999, by a vote of 11 in favor to 1 against, with 1 member not voting. The district court did not say who the voters were or what capacity they voted in, but we reasonably may infer from other findings of fact that it was a board of directors. It appears from the district court's findings that on paper Farm Bureau and Farm Bureau Services have separate boards of directors, but in practice their memberships probably are identical.

K.S.A. 17-1614, a section of the KCMA, provides for the removal of an officer:

"(a) Any member or voting stockholder may bring charges against an officer or director by filing them in writing with the secretary of the association, together

with a petition signed by 10% of the members, requesting the removal of the officer or director in question. The removal shall be voted upon at the next regular or special meeting of the association and, by a vote of a majority of the outstanding shares of voting stock, or if the association is organized on a one person, one vote plan, then by a majority vote of the association's members or voting stockholders present and voting, the officer or director so charged shall be removed. A successor shall be elected to fill the unexpired portion of the term of such officer or director.

"(b) The director or officer against whom such charges have been brought shall be informed in writing of the charges previous to the meeting and shall have an opportunity at the meeting to be heard in person or by counsel and to present witnesses; and the person or persons bringing the charges against such director or officer shall have the same opportunity."

This method is sometimes referred to as the "charge and petition method" of removing officers. Hall contends that it is the exclusive method for removal of an officer of a business entity organized under the KCMA and that defendants did not comply with the statute.

Farm Bureau and Farm Bureau Services contend that K.S.A. 17-1614 officer removal procedure is not the only method that could lawfully have been used in removing Hall. Defendants contend that another provision of the KCMA, K.S.A. 17-1628, sanctions removal of an officer by a simple vote of the board of directors, as provided in the general corporation code. K.S.A. 17-1628 provides: "The provisions of the general corporation code of this state and all powers and rights thereunder shall apply to the associations' organized hereunder, except where such provisions are in conflict with or inconsistent with the express provisions of this act . . . ." K.S.A. 17-6302(b) of the Kansas corporation code allows officers to be removed without cause by the board of directors at whose pleasure an officer serves. K.S.A. 17-6302(b) provides: "Officers . . . shall hold their offices for such terms as are prescribed by the bylaws or determined by the board of directors or other governing body. *Each officer shall hold the office until such officer's* successor is elected and qualified or until such officer's earlier resignation or *removal.*" (Emphasis added.)

Applying K.S.A. 17-1628, the district court concluded that the KCMA's charge and petition method of removal of an officer by

the membership is not inconsistent with nor does it prohibit removal by the board of directors. Predictably, Hall asserts that the removal methods of KCMA and the general corporation code are patently inconsistent with one another. Farm Bureau argues that the provisions are different from one another but not incompatible.

The two statutory methods for the removal of officers are not consistent with one another. The KCMA provides that the membership of the association votes on removal of an officer. The membership votes only when an officer has been charged and a petition has been signed by 10% of the association members and only after the officer has had an opportunity to respond to the charge. In contrast, the corporation code permits a board of directors to remove an officer at any time with or without cause.

Relying on *Consumers Cooperative Ass'n v. Arn,* 163 Kan. 489, 183 P.2d 453 (1947), Farm Bureau argues that the court must resolve the apparent conflict between the provisions of the KCMA and the corporation code by giving precedence to the corporation code. The question in *Consumers Cooperative* was whether charter amendments had to be approved by the charter board. The KCMA provided that amendments to the charter of an association "shall be filed in accordance with the provisions of the general corporation law of this state and be approved by the charter board." G. S. 1935, 17-1608. The charter board approval requirement had been repealed from the general corporation code in 1939. Due to the express repeal of the requirement, the court concluded that it would be "inconsistent with the legislative intent to hold it was intended an amendment of plaintiff's articles of incorporation should be required to have the approval of the charter board." 163 Kan. at 494. The court concluded that "the provisions of the present general corporation code with respect to amendments are not in conflict with or inconsistent with [the pertinent provision] of the marketing act when the latter statute is interpreted in accordance with the legislative intent." 163 Kan. at 494. In other words, the two statutory provisions were harmonized on the basis of legislative intent. The court did not hold that the general corporation code in all cases of inconsistencies would control over the KCMA. Farm Bureau has not suggested to the court that there is legislative intent

regarding the officer removal provision of the KCMA or that of the general corporation code that might serve as a basis for harmonizing the two.

On another tack, Farm Bureau offers policy reasons for permitting the association to have an officer removed by the board of directors, as provided by the general corporation code. Farm Bureau contends that the KCMA procedure is cumbersome and time-consuming and would "hamstring" associations in circumstances requiring prompt action. No policy consideration, however, may trump the procedure plainly prescribed by the legislature in the KCMA.

We conclude that Farm Bureau wrongfully terminated Hall as president of Farm Bureau. However, as Farm Bureau points out, that conclusion does not entitle Hall to recover monetary damages from Farm Bureau because he was not compensated for services as president or director of Farm Bureau. For that reason, according to Farm Bureau, resolution in favor of Hall is "largely academic." We agree. Hall's termination as president of Farm Bureau does not entitle him to a judgment against Farm Bureau, nor does it impact the other issues raised by Hall. Although we find the district court's reasoning for granting summary judgment to Farm Bureau to be faulty, it is not reversible error.

Hall next asserts that his termination as a paid employee of Farm Bureau Services constituted retaliatory discharge. Hall was removed from the presidency of Farm Bureau Services by a vote of the board of directors, which was authorized under the general corporation code, K.S.A. 17-6302(b). Hall contends, however, that his removal as the paid president of Farm Bureau Services constituted termination of employment. The district court concluded that although Hall received a salary as president of Farm Bureau Services, his employment was incidental to his election as a corporate officer so that Hall's removal as an officer does not give rise to a viable cause of action under an employment theory of law. We disagree.

It literally is hornbook law that even though a board of directors may remove an officer with or without cause, removal at the pleasure of the board of directors is without prejudice to the right to

recover damages for any wrongful removal in breach of an employment contract. Henn and Alexander, *Laws of Corporations and Other Business Enterprises,* §§ 210, 221 (3d ed. 1983). Although the district court's view of an officer's employment as incidental was incorrect, the denial of Hall's retaliatory discharge claim was not.

Hall argues that his termination constitutes a public policy exception to the employment-at-will doctrine, as recognized in *Coleman v. Safeway Stores, Inc.,* 242 Kan. 804, 752 P.2d 645 (1988). The specific holding of *Coleman* is:

"[E]mployees covered by collective bargaining agreements who are wrongfully discharged in violation of state public policy, in this case the policy underlying the Workers' Compensation Act, have a tort cause of action for retaliatory discharge. We stress that by recognizing this cause of action for Coleman and those like her, we do not hold that employees covered by collective bargaining agreements have a tort cause of action for wrongful discharge in general." 242 Kan. at 815.

The public policy exception to employment-at-will for retaliatory discharge for filing a workers compensation claim had been recognized some years before *Coleman.* See *Murphy v. City of Topeka,* 6 Kan. App. 2d 488, 630 P.2d 186 (1981). The significance of the *Coleman* decision was that it extended the exception to employees covered by collective bargaining agreements. Neither a workers compensation claim nor a collective bargaining agreement figure in the present case.

The other exception recognized by Kansas courts to the employment-at-will doctrine is for whistle-blowing. See *Fowler v. Criticare Home Health Services, Inc.,* 271 Kan. 715, 26 P.3d 69 (2001). There is no claim of whistle-blowing in the present case.

Based on his misreading of *Coleman,* Hall argues that Kansas courts recognize another exception where the termination broadly contravenes public interest. Even if Kansas courts were to recognize such an exception, Hall's allegations fail to embrace any matters of public, as opposed to corporate, interest. As Hall asserts in his brief, he was terminated "in retaliation for legislative and policy actions in the best interests of Defendants." Hall further states in his brief that he was terminated despite his "attempting to act in the best interest of Farm Bureau's members before the legislature"

and that "the Board accused Mr. Hall of 'micro managing' and 'going where he wanted, when he wanted, without Board approval.' " The district court did not err in denying Hall's claim based on retaliatory discharge, but did so for the wrong reason. A trial court decision which reaches the right result will be upheld, even though the trial court may have relied upon the wrong ground or assigned erroneous reasons for its decision. *Bank of Kansas v. Davison*, 253 Kan. 780, 792, 861 P.2d 806 (1993).

Hall next alleged that an implied contract was created by the customary 2-year presidential term. The district court concluded otherwise:

"Hall served at the pleasure of his fellow board members until a new slate of officers were elected by the Board of Directors following the annual meeting and had no implied contract based upon these facts. The Board of Directors had the authority to remove Hall as a salaried officer pursuant to its Bylaws and the general corporation code. The implied contract claim is not viable."

Kansas courts recognize that parties may become contractually obligated by their conduct as well as by their use of oral or written words. *Atchison County Farmers Union Co-op Ass'n v. Turnbull*, 241 Kan. 357, 363-64, 736 P.2d 917 (1987). Evidence of a contract implied in fact shows a mutual intent to contract. *Mai v. Youtsey*, 231 Kan. 419, 422, 646 P.2d 475 (1982). An implied agreement cannot be established solely by the employee's subjective understanding or expectation about his or her employment. *Brown v. United Methodist Homes for the Aged*, 249 Kan. 124, 133, 815 P.2d 72 (1991).

"Where it is alleged that an employment contract is one to be based upon the theory of 'implied in fact,' the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced." *Allegri v. Providence-St. Margaret Health Center*, 9 Kan. App. 2d 659, Syl. ¶ 5, 684 P.2d 1031 (1984).

As factual support for an implied contract, Hall directs the court's attention to two paragraphs of the facts he proposed as

uncontroverted in response to the defendants' motion for summary judgment. The district court did not adopt Hall's proposed paragraphs, and as we previously noted, Hall did not challenge the district court's findings of fact.

As noted by the district court, there is a section of the Farm Bureau bylaws that seems to provide for annual election of officers: "The Board of Directors, *immediately following the annual meeting* and in accordance with Article VI, Section 1 of these Bylaws, shall elect out of their number, a President, a first Vice-President and a State Chairman of Farm Bureau Women. (Emphasis added.)" On the other hand, there is another section of the Farm Bureau bylaws that expressly provides for a 2-year presidency term:

"The Board of Directors shall consist of thirteen members and shall be elected by the Voting Delegates at the Annual Meeting. Three shall be elected Directors-at-large, one with the recommendation that he or she be elected *President for a two-year term*, one with the recommendation that he or she be elected Vice-President for a two-year term. (Emphasis added.)"

The seeming incongruity of the two sections of Farm Bureau's bylaws need not be resolved because Hall was not employed as president by Farm Bureau, as we have noted. Hall was compensated as president of Farm Bureau Services but not as president of Farm Bureau. Thus, the bylaws that are material to this question are those of Farm Bureau Services, and the express provision of a 2-year presidential term in the Farm Bureau bylaws need not be considered.

The bylaws of Farm Bureau Services provide for a board of director consisting of 13 persons who serve terms of 4 years each. "The Board of Directors shall annually elect out of their number a President and a First Vice-President." The election occurs "without unnecessary delay after the annual meeting of the stockholders." And, "[a]fter each annual election of officers, their bonds shall be submitted anew for the approval of the Directors." Examination of the Farm Bureau Services bylaws reveals one provision that indicates the directors may set the length of officers' terms regardless of the annual election provisions. It provides that the president and other officers "shall each serve for the term fixed by the Board of Directors and until their successors shall have been elected or ap-

pointed and have qualified." There seems to be nothing in the record that would link this latter provision with a 2-year presidential term.

The record does not contain evidence from which it may be inferred that the intention of the parties at the time Hall's presidency commenced was for him to serve a 2-year term. In this circumstance, the district court did not err in granting summary judgment against Hall on his claim of a breach of an implied 2-year contract of employment.

Hall next asserts that the statements by general counsel for Farm Bureau and Farm Bureau Services constituted actionable defamation of Hall. In his petition, Hall alleged that Terry Arthur, counsel for Farm Bureau and Farm Bureau Services, made the following statement to the voting delegates and county presidents of Farm Bureau at their annual meeting in November 1999:

"The audit disclosed that between January 1, 1996 and August 17, 1999, Gary Hall received checks for reimbursement of such expenses from FBL, Financial, and American Farm Bureau. The audit revealed that, as of his date of termination, $10,467.00 had been received by Gary Hall and not reimbursed to Kansas Farm Bureau Services, Inc., even though that company had paid those travel expenses."

The district court found that "Hall owed $5,888.00 to KFB Services for unreimbursed expenses as of August 17, 1999," and that "Hall owed KFB Services $10,468.00 [should be $10,467] for unreimbursed expenses as of the audit report date of October 4, 1999." The complained-of aspect of Arthur's statement was that he said Hall owed $10,467 as of August 17, 1999, when he actually owed $5,888 on that date and owed $10,467 on October 4, 1999.

The district court also found that "[n]o special damages were suffered by Hall due to the alleged defamatory statement." As the court stated in *Moran v. State*, 267 Kan. 583, 598-99, 985 P.2d 127 (1999), the term "special damages" in a defamation context means nothing more than actual damages.

The district court gave several reasons for granting summary judgment for defendants and against Hall on Hall's defamation claim. The district court stated that Hall had neither alleged nor come forward with evidence of actual damages other than lost wages, which were due to termination from his employment rather

than from defamation. In the alternative, the district court concluded that summary judgment was justified on the ground that the communication was privileged. The district court concluded that "Hall's defamation claim is not viable in that Hall has not produced any evidence that he has been injured by the misstated date or that the misstated date was defamatory."

The elements of defamation include false and defamatory words, communicated to a third person, which result in harm to the reputation of the person defamed. *Luttrell v. United Telephone System, Inc.*, 9 Kan..App. 2d 620, 620-21, 683 P.2d 1292 (1984), *aff'd* 236 Kan. 710, 695 P.2d 1279 (1985). In *Moran*, the court discussed and quoted from *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974), regarding damages and proof:

"In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974), the United States Supreme Court ruled: 'It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury.' 418 U.S. at 349. *Gertz* changed the law in Kansas. Damages recoverable for defamation, whether per se or not, could no longer be presumed but must be proven. The issue raised by defendants in this cross-appeal is best answered by Justice Powell, speaking for the majority in *Gertz*:

'We need not define "actual injury," as trial courts have wide experience in framing appropriate jury instructions in tort actions. Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury.' 418 U.S. at 349-50." 267 Kan. at 599.

In his petition, Hall alleged that as a result of the defamation he suffered "damage in the form of injury and harm to his reputation in an amount exceeding $75,000.00." Regarding evidence that Hall had come forward with, the district court stated: "[Hall] testified in a deposition that there are no special damages due to the alleged defamatory statement and that his only damages were lost wages . . . ." Examination of the portions of Hall's deposition that the defendants attached to their motion for summary judgment confirm the district court's statement about Hall's deposition tes-

timony. Hall was asked about his answer to an interrogatory about damages due to the alleged defamatory statements, and he agreed that his damages for damage to reputation were the same as his damages for lost income for the remainder of his expected 2-year term. He sought $11,000 per month for 15 months for a total of $165,000. An affidavit by Hall also found in the record further illustrates that Hall equates the damage to his reputation with the loss of his employment:

"The statements by Terry Arthur at the Farm Bureau's annual meeting in November, 1999 resulted in a negative view of my service as President by the County Presidents and delegates hearing the statements, which was contrary to the view previously expressed by those persons. Thereafter, several of the County Presidents advised me that they intended to support the Board's action in terminating me, and it was suggested that I resign as a Director of Kansas Farm Bureau. These County Presidents advised that they wanted the Annual Meeting to focus on policy issues rather than personnel issues."

In these circumstances, the only damages were the result of his termination as president of Farm Bureau Services.

As the district court concluded, Hall's real problem would seem to be his lack of any evidence that the damage to his reputation was due to Arthur's falsely stating that according to an audit, in August 1999 Hall owed $10,467 in accounts payable instead of stating that in August 1999 Hall owed $5,888 in accounts payable. If Hall's reputation were damaged by the inaccurate statement that he owed $10,467 as of August 1999, where is the showing that his reputation as president of Farm Bureau Services would not have been equally or nearly equally damaged by the accurate statement that he owed $5,888 at that time? The gravamen of the statement is that Hall owed thousands of dollars for unreimbursed expenses in August 1999, and that core message was the same whether the figure given by Arthur was $5,888 or $10,467. The lack of any fundamental difference in the core message between Arthur's statement and the accurate statement is what the district court referred to in concluding that Hall had not shown that he was injured by the misstated date or that the misstatement was defamatory. The difference between the dollar amount stated by Arthur and the actual dollar amount owed by Hall in August 1999 is not

what is denigrating about the communication. What is denigrating is the message that in August 1999 Hall owed thousands of dollars in unreimbursed expenses, and that message is accurate. Thus, the wrong dollar amount, which is the only false information communicated by Arthur, was not shown to result in harm to Hall's reputation.

A party opposing a summary judgment may not rest merely on allegations, but must set forth specific facts to support its position. K.S.A. 2001 Supp. 60-256(e). In this case, Hall provided no evidence that would tend to support his position that the dollar figure given by Arthur, rather than the fact that he owed thousands of dollars in unreimbursed expenses, caused harm to his reputation. Where there is an absence of evidence necessary to support an essential element of the plaintiff's claim, defendants are entitled to summary judgment. *Saliba v. Union Pacific R.R. Co.*, 264 Kan. 128, 131, 955 P.2d 1189 (1998). In this case, the district court's entry of summary judgment in favor of defendants on the ground that there was an absence of evidence to support the harm-to-reputation element of Hall's defamation claim was appropriate.

In the alternative, the district court concluded that Arthur's communication was privileged. In *Luttrell*, the Court of Appeals noted that "the law in this state has already extended protection to comments made within a work situation by means of a qualified privilege." 9 Kan. App. 2d at 622. The Court of Appeals defined a qualifiedly privileged communication as one

"made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, if it is made to a person having a corresponding interest or duty. The essential elements of a qualifiedly privileged communication are good faith, an interest to be upheld, a statement limited in its scope to the upholding of such interest and publication in a proper manner only to proper parties." 9 Kan. App. 2d at 622 (citing *Dobbyn v. Nelson*, 2 Kan. App. 2d 358, 360, 579 P.2d 721, *aff'd* 225 Kan. 56 [1978]).

Discussing *Dobbyn*, the Court of Appeals stated that it "held that a letter written by an employee of the Kansas State University library concerning the conduct of another employee and transmitted to the second employee's superior was qualifiedly privileged. *Dobbyn*, 2 Kan. App. 2d at 361." *Luttrell*, 9 Kan. App. 2d at 622.

Liability for defamation can be based on a qualifiedly privileged communication only where the plaintiff can prove defendants acted with knowledge that the communication was false or with reckless disregard for the truth. 9 Kan. App. 2d at 622 (citing *Scarpelli v. Jones*, 229 Kan. 210, 216, 626 P.2d 785 [1981]).

If for no other reason, summary judgment on the ground that Arthur's communication was qualifiedly privileged would be inappropriate in this case because the district court made no factual findings germane to the good faith element. The district court made several findings about the interested nature of the audience Arthur made his statement to, but none about Arthur's state of mind in giving it.

Finally, Hall asserts that Farm Bureau and Farm Bureau Services committed actionable negligence by failing to provide guidance to Hall regarding acceptable conduct in his employment. Hall alleged that defendants breached a duty they owed to him "accurately to disclose all material facts and information concerning his employment with Defendants." Hall's theory, as stated in his brief, is that the breach consisted of defendants failing "to identify to him the standard upon which he would be judged as Farm Bureau President." As a result, Hall states in his brief, he did not know how to behave as president. He cites no authority for this novel theory.

To recover for negligence, a plaintiff must prove the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered. *Hesler v. Osawatomie State Hospital*, 266 Kan. 616, Syl. ¶ 2, 971 P.2d 1169 (1999). Whether a duty exists is a question of law. *Nero v. Kansas State University*, 253 Kan. 567, Syl. ¶ 1, 861 P.2d 768 (1993). In this case, the district court concluded that Hall failed to articulate the existence of a duty owed to him that is recognized in law. It follows that Hall also was not able to identify a breach of that duty or injury suffered as a result of a breach.

The district court's conclusion is correct. Kansas courts do not recognize an employer's duty to tell an employee, especially an established employee, how to maintain his employment.

Affirmed.