**EDWARDS & ASSOCIATES, INC. and Horace Edwards, Plaintiffs,**

v.

**BLACK & VEATCH, L.L.P., Defendant.**

No. 98–2563–JWL.

United States District Court, D. Kansas.

Feb. 7, 2000.

Dan Biles, Randall L. Manvitz, Gates, Biles, Shields & Ryan, Overland Park, KS, Mark A. Buchanan, Scott A. McCreight, Sprenger & McCreight, L.C., Kansas City, MO, for plaintiffs.

John R. Phillips, Rosetta B. Robins, Darryl K. Uffelmann, Blackwell, Sanders, Peper, Martin, LLP, Kansas City, KS, for defendant.

*MEMORANDUM AND ORDER*

LUNGSTRUM, District Judge.

This suit arises out of a coordinated effort among the parties and others to secure a government contract for engineering services relating to the development of a traffic management system in the Kansas City area. Plaintiffs, a minority business enterprise and its owner, allege that defendant refused to allow plaintiffs to participate meaningfully in the project after securing the contract. In that regard, plaintiffs allege that defendant interfered with plaintiffs' civil rights in violation of 42 U.S.C. §§ 1981, 1982, 1983, 1985, and 2000d (Title VI of the Civil Rights Act of 1964) and also assert a variety of state common law claims.

This matter is presently before the court on defendant's motion for summary judgment (doc. # 51). As set forth in more detail below, defendant's motion is granted in part and denied in part. Specifically, defendant's motion for summary judgment is granted with respect to plaintiffs' section 1983, section 1985, fraud and breach-of-fiduciary-duty claims. Defendant's motion for summary judgment is denied with respect to plaintiffs' section 1981, section 1982, section 2000d (Title VI),defamation and breach-of-contract claims.

## I. Facts

The following facts are either uncontroverted or related in the light most favorable to plaintiffs, the nonmoving parties. Plaintiff Edwards & Associates, Inc. (EAI) is a Kansas corporation with its principal place of business in Topeka, Kansas. EAI is a multi-disciplinary engineering firm in the business of providing a myriad of professional services in connection with transportation-related issues. Pursuant to certain governmental regula-

tions, EAI is certified as a Disadvantaged Business Enterprise (DBE) or, as it is sometimes referred to, a Minority Business Enterprise (MBE).[1] Plaintiff Horace Edwards, an African–American, is the shareholder and principal of EAI. Mr. Edwards is a registered professional engineer, a former Secretary of Transportation for the State of Kansas, a former transportation company president, and the recipient of numerous honors and awards in his field. Defendant Black & Veatch is a limited liability partnership that provides engineering and construction services as well as transportation consulting.

In early 1994, plaintiffs participated in a study organized by the Kansas and Missouri Departments of Transportation (hereinafter referred to KDOT and MODOT, respectively). The study assessed transportation needs in the Kansas City metropolitan area and developed a plan for addressing those needs through deployment of an intelligent transportation system (ITS).[2] An ITS seeks to make traveling safer and more efficient by utilizing technology such as roadway sensors and cameras to monitor traffic and to alert drivers of problems, hazards or other delays. In 1996, as a result of the early deployment study, KDOT and MODOT requested proposals from engineering firms for the design and development of the Kansas City Intelligent Transportation System (KCITS). As set forth in the written solicitation for proposals, KDOT and MODOT established a ten percent (10%) DBE goal for the contract.[3]

In an effort to secure the KCITS contract, Lee Mixon and Warren Keith, Black & Veatch project managers, contacted Castle Rock Consultants (CRC) and National Engineering Technologies (NET) to

---

1. The DBE Program establishes participation goals in public projects for firms owned and controlled by socially and economically disadvantaged individuals.

2. The study is referred to as the Intelligent Transportation System Early Deployment Study.

3. A proposal was deemed responsive only if the requisite percentage of minority participation was attained by certified minority businesses.

determine if they were interested in pursuing the KCITS project. Both CRC and NET agreed to become a part of the Black & Veatch project team. Subsequently, Mssrs. Mixon and Keith contacted Mr. Edwards to determine if plaintiffs were interested in pursuing the project. In response to defendant's recruiting efforts, according to Mr. Edwards' affidavit,[4] Mr. Edwards emphasized to Mssrs. Mixon and Keith that plaintiffs would join the project team only if EAI would have significant and substantial participation in the project beyond the contract's ten percent DBE goal. Mr. Edwards further testified that he explained to Mssrs. Mixon and Keith that Black & Veatch "should not think of either EAI [or plaintiff] simply as a minority business enterprise and a minority engineer, but as qualified engineers capable of providing various professional services necessary for the success of the project." According to Mr. Edwards, Mr. Keith agreed that plaintiffs' participation in the project would be extensive and, in fact, would be "double" the ten percent

DBE goal. Moreover, Mr. Keith allegedly advised Mr. Edwards that Black & Veatch had no intention of seeking any other minority firm for the project. Mr. Edwards testified that plaintiffs agreed to join defendant's project team based on defendant's representations about plaintiffs' participation in the project.[5]

In February 1997, the "Black & Veatch Transportation Group," comprised of Black & Veatch, CRC, NET and EAI, submitted a proposal to KDOT and MODOT for the design and development of the KCITS. In its proposal, the Transportation Group represented to KDOT and MODOT that the Group was "sincerely committed to exceeding your 10% goal for minority participation on this project."[6] According to Black & Veatch, it intended plaintiffs to be responsible for the public involvement portion of the project because it believed plaintiffs had the capabilities to meet the public involvement needs of the KCITS project. Plaintiffs contend that Black & Veatch indicated its intention to have plaintiffs perform a multitude of significant

4. In its reply brief, defendant argues that much of the evidence that plaintiffs submit in response to defendant's motion has no probative value because it is based, in large part, on Mr. Edwards' own "self-serving" affidavit. As this court has previously explained, this argument "exhibits a fundamental misunderstanding of summary judgment practice:"

> At the summary judgment stage, affidavits must "set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e); *Committee for the First Amendment v. Campbell*, 962 F.2d 1517, 1526 n. 11 (10th Cir.1992) ("In opposing a motion for summary judgment, the nonmovant must make a showing that, 'if reduced to admissible evidence,' would be sufficient to carry the nonmovants burden of proof at trial.") (quoting *Celotex*, 106 S.Ct. at 2555) (emphasis added).
> ... [T]he nonmoving party need·not produce evidence "in a form that would be admissible at trial," *Celotex*, 106 S.Ct. at 2553, but the content or substance of the evidence must be admissible. *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267–68 (7th Cir. 1994).... "[G]eneralized, unsubstantiated, non-personal affidavits are insufficient. to

> successfully oppose a motion for summary judgment." *Stevens v. Barnard*, 512 F.2d 876, 879 (10th Cir.1975).

*Aldridge v. State of Kansas*, No. 96–2382–JWL, 1997 WL 614323, at *4–5 (D.Kan. Sept.10, 1997) (quoting *Thomas v. International Bus. Machines*, 48 F.3d 478, 485 (10th Cir.1995)). Like the plaintiff's affidavit in *Aldridge*, Mr. Edwards' affidavit, "self serving though it may be, is perfectly proper at the summary judgment stage." *See id.* at *5. The court evaluates the validity of Mr. Edwards' affidavit not by examining whom the affidavit serves, but rather by examining whether the affidavit relates specific, personalized facts within Mr. Edwards' knowledge. *See id.* Mr. Edwards' affidavit satisfies this burden.

5. Black & Veatch denies that plaintiffs were ever promised a certain percentage of the KCITS project and further denies that any discussions were had with Mr. Edwards concerning the amount or degree of participation plaintiffs would have in the project.

6. Although the Group's proposal did not represent that it would rely entirely on EAI in its efforts to exceed the minority participation goal, no other DBE firms were identified in the Group's proposal.

roles with respect to the project on numerous occasions. In addition to the alleged representations set forth above, plaintiffs highlight language found in the Group's cover letter submitted to KDOT and MODOT with its proposal. In the cover letter, Mr. Keith stated that "[a]lthough Edwards and Associates will be responsible for leading our Public Involvement Program, they, and particularly Horace Edwards himself, will be heavily involved in our Interagency Coordination Program and many other equally important roles." Moreover, the proposal itself identifies EAI as a "key member" of the ITS Early Deployment Study and that EAI would provide "similar services" for the project. According to Mr. Edwards, EAI provided a variety of services associated with the early deployment study, including user requirements identification, public involvement and project management. Thus, as Mr. Edwards further testified, the proposal language confirmed for Mr. Edwards that plaintiffs would enjoy substantial participation in the project.

In May 1997, the Black & Veatch Transportation Group was advised that it was the successful bidder on the project. Unlike most engineering contracts, the KCITS project required the successful bidder (the Transportation Group) and the Departments of Transportation to negotiate an initial scoping agreement. A scoping agreement is a separate contract designed to develop the final scope of services to be provided by each of the entities working on the project—Black & Veatch, CRC, NET and EAI. In that regard, the project participants, together with KDOT and MODOT, held a series of meetings, called "scoping meetings," during which the parties discussed and defined the nature and scope of services that each entity would provide.

The first scoping meeting was scheduled for July 18, 1997.[7] The purpose of this particular scoping meeting was to focus on the public involvement aspect of the project (the aspect of the project that, according to Black & Veatch, was plaintiffs' anticipated area of responsibility) and interagency coordination. Several weeks before the meeting, Mr. Edwards contracted with another individual, Lisa Austin, to be a "key participant" in the public involvement portion of the project. Ms. Austin is a former MODOT employee who performs independent consulting work.[8] Both Mssrs. Keith and Mixon approved the contractual relationship between Mr. Edwards and Ms. Austin. Mr. Edwards requested that Ms. Austin take a lead role in the July 18, 1997 scoping meeting by making a presentation on public involvement.

At the July 18, 1997 scoping meeting, Ms. Austin began her presentation centering on the public involvement goals of education and awareness programs. Typically, these programs include public meetings, targeted newsletters, and planned focus groups. The parties dispute what happened next. According to Black & Veatch, Mr. Edwards abruptly interrupted Ms. Austin during her presentation, expressed disagreement with her approach and began presenting his version of public involvement issues for the KCITS project, a version that included information-gathering from fire departments, police departments, and emergency medical technicians in order to determine how the KCITS could benefit them. Black & Veatch further asserts that Mr. Edwards' focus on benefits to public agencies was inconsistent with the "general public" emphasis of the scoping meeting. Mr. Edwards' recollection of the scoping meeting varies

---

7. The record reflects that one or more "preliminary" scoping meetings took place in June 1997. Nonetheless, the parties have not provided the court with any detail about the nature or extent of these preliminary discussions.

8. Apparently, Ms. Austin had assisted the entire Black & Veatch project team in the making of its oral presentations to the selection committee for the KCITS project.

somewhat from that of Black & Veatch's witnesses. According to Mr. Edwards, Ms. Austin made a remark during the course of her presentation that solicited an immediate decision from the group about certain aspects of the public involvement program. Mr. Edwards briefly interrupted Ms. Austin to state, simply, that a decision did not need to be made at the meeting. At that point, Ms. Austin continued her presentation until a mid-morning break. Mr. Edwards averred that his interruption was neither unprofessional nor demeaning and, in fact, was in keeping with the kinds of exchanges that typically took place during scoping meetings.

During this mid-morning break, at least two MODOT officials, Bill Yarnell and Patrick Walker, had a conversation with Mssrs. Keith and Mixon about the public involvement presentation. The substance of this conversation is in dispute. According to Mr. Keith, Mssrs. Yarnell and Walker questioned Mr. Edwards' qualifications to lead the public involvement program in light of his presentation and asked Mr. Keith to remove Mr. Edwards and EAI from the project team. Mr. Keith further testified that the MODOT officials suggested that if he insisted on keeping plaintiffs on the team in a lead role, then perhaps the team was not the "right" team for the job. Based on this alleged statement, Mr. Keith claims that he felt as if Black & Veatch would lose the project if he did not remove plaintiffs from the lead role in public involvement. According to Mr. Keith's testimony, he understood that Mssrs. Yarnell and Walker wanted plaintiffs removed from the lead role in public involvement based solely on Mr. Edwards' presentation during the July 18, 1997 scoping meeting.[9]

Like Mr. Keith, Mr. Mixon testified that Mssrs. Yarnell and Walker, during this mid-morning break, "instructed" him to remove plaintiffs from the lead role in public involvement. Specifically, Mr. Mixon testified that the MODOT officials told Mssrs. Keith and Mixon that plaintiffs "would not be the lead on this task because [the officials] did not believe [Mr. Edwards] was qualified to do it" based on what they had seen (and presumably, heard) during the public involvement presentation. According to Mr. Mixon, Mssrs. Yarnell and Walker were concerned with the content of the presentation and the conflict between Mr. Edwards and Ms. Austin. Mr. Mixon does not recall that the MODOT officials provided any "specifics" regarding their concerns with the content of the presentation.[10] Finally, like Mr. Keith, Mr. Mixon recalled Mssrs. Yarnell and Walker "definitely impl[ying]" that MODOT would take the project away from Black & Veatch if the directive to remove plaintiffs from the lead role was not followed.

Mssrs. Yarnell and Walker, however, testified that they did not instruct Black & Veatch to remove plaintiffs from the lead role in public involvement. According to Mr. Yarnell, he indicated to Mssrs. Mixon and Keith that he was "really disappointed in the direction and the nature of things that had happened at the meeting that morning, and that [he] hoped that they would get their act together and get things straightened out." Mr. Yarnell testified that he had no recollection of giving any direction to Black & Veatch about plaintiffs' participation in the project and that he did not believe he would have told Black & Veatch to remove plaintiffs from the lead role on the public involvement program. Like Mr. Yarnell, Mr. Walker

---

9. Although Mr. Keith testified that he found Mr. Edwards' presentation to be "ill-prepared" and "disjointed," he also testified that he thought it was "unfair" for the MODOT officials to seek to remove plaintiffs from their lead role in the public involvement program based solely on Mr. Edwards' presentation.

10. Mr. Mixon was not in the room during Mr. Edwards' presentation and, thus, has no firsthand knowledge of the content of that presentation.

testified that he expressed some disappointment to Mssrs. Mixon and Keith about the public involvement presentation. According to Mr. Walker's testimony, no one involved in the conversation reached the conclusion that plaintiffs should be removed from their role in the public involvement program. Moreover, Mr. Walker testified that he had never heard anyone from MODOT tell Black & Veatch that they had to remove plaintiffs from the program or otherwise reduce plaintiffs' participation in the project.

Nonetheless, Mssrs. Keith and Mixon allegedly decided that they had to remove plaintiffs from the lead role in public involvement in order to retain the project for Black & Veatch. In September 1997, Black & Veatch sent to MODOT and plaintiffs a proposed subconsultant agreement which, on its face, purported to allocate EAI a total fee of $746,943 (or 9.3% participation) for public involvement and final design work on the project. Of this fee, $368,203 represented compensation for plaintiffs' professional services including public involvement and other duties to be performed by plaintiffs. The remaining $378,740 was for ancillary public involvement expenses expected to be incurred in the public involvement portion of the total project. Thus, according to plaintiffs, the actual professional minority participation in the project was only 5.4% of the total project after expenses were deducted. Plaintiffs allege that Black & Veatch assigned these expenses to plaintiffs as part of a scheme to "superficially" inflate the minority participation rate (*i.e.*, to make minority participation in the project appear higher than it actually was).[11] Black & Veatch maintains that the ancillary public involvement expenses as set forth in the agreement were consistent with those expenses typically associated with public involvement services. In any event, Mr. Edwards objected to the inclusion of the ancillary public involvement expenses in the agreement and requested that the expenses be deleted from the agreement.

In October 1997, negotiations commenced with respect to the prime agreement for the design and development of KCITS. In June 1998, after approximately seven months of negotiations, Black & Veatch, MODOT and KDOT entered into the prime agreement. Despite the project's ten percent minority participation goal, the agreement contemplated that EAI would complete 4.94% of the total services (measured in dollar value) to be performed under the contract. Because this percentage was less than the participation goal,[12] the contract required Black & Veatch to "certify" that it had made "good faith efforts" to meet the ten percent goal.[13] Nonetheless, the record does not reflect that Black & Veatch made any efforts to obtain a ten-percent level of DBE participation in the project. In fact, the contract language fails to identify any specific good faith efforts made by Black & Veatch in the very paragraph that contemplates the required "certification" and, instead, notes that MODOT agreed to waive the ten percent DBE goal:

> If the Consultant's agreed DBE goal amount as specified [above] is less than the Commission's DBE goal given [below], then the Consultant certifies that the following good faith efforts were taken by Consultant in an attempt to obtain the level of DBE participation set by the

---

11. Plaintiffs further allege that Black & Veatch attempted to assign to EAI approximately 92% of all public involvement expenses even though EAI's role had been reduced to only one-third of the actual professional services related to public involvement. In essence, plaintiffs claim that Black & Veatch reduced EAI's role to that of a purchasing agent for goods and services to be requisitioned by a non-minority community relations manager.

12. No other DBE was identified in the contract.

13. Specifically, the contract states as follows: "The Consultant must document the good faith efforts it made to achieve [the] DBE goal, if the agreed percentage specified ... below is less than the percentage stated [above]." *See* Pltfs. Exh. 4, Project Design Consultant Agreement, section(7)(B)(7).

Commission [above]: Due to the technical complexity and the highly specialized expertise required for the community relation component of the project it was not possible to identify qualified DBEs to provide the necessary service to reach the agencies [sic] DBE goal. During the negotiation of the contract the District Engineer granted a lesser DBE [percentage] to ensure the integrity of the project is maintained.

*See* Pltfs. Exh. 4, Project Design Consultant Agreement, section (7)(B)(9).[14]

In June and July 1998, Black & Veatch forwarded subconsultant agreements to CRC and NET for participation in the KCITS project. On July 17, 1998, Black & Veatch sent plaintiffs another proposed subconsultant agreement. This agreement omitted any reference to the ancillary public involvement expenses. The proposed agreement reflected total fees of $345,000 for plaintiffs. Mr. Edwards refused to sign the agreement. During August and September 1998, Mr. Edwards expressed his concerns (both verbally and in writing) about the agreement. Mr. Edwards was primarily concerned with the scope of EAI's services as contained in the agreement. According to Mr. Edwards, the agreement contemplated project management assignments for EAI that were "trivial" and represented a "radical departure" from the prior understanding among the parties regarding EAI's scope of services. No written subconsultant agreement was ever executed between Black & Veatch and plaintiffs.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.

1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *see Adler,* 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy

**14.** Similar language appeared in a December 1997 draft of the prime agreement.

and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Plaintiffs' Section 1981 and Section 1982 Claims

In the pretrial order, plaintiffs claim that Black & Veatch reduced plaintiffs participation in the KCITS project on the basis of Mr. Edwards' race in violation of section 1981 and section 1982. Black & Veatch moves for summary judgment on the grounds that plaintiffs have failed to set forth sufficient facts with respect to their prima facie case of discrimination and, in any event, that plaintiffs have failed to demonstrate that its proffered reason for reducing plaintiffs' participation in the project is pretextual. As set forth below, the court rejects these arguments and denies defendant's motion with respect to plaintiffs' section 1981 and section 1982 claims.

■ Section 1981 addresses racial discrimination in contractual relationships. As amended by the Civil Rights Act of 1991, the statute reads in relevant part:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens....

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981(a)–(c). By its language, then, section 1981 establishes four protect-

ed interests: (1) the right to make and enforce contracts; (2) the right to sue, be parties, and give evidence; (3) the right to the full and equal benefit of the laws; and (4) the right to be subjected to like pains and punishments. *See Phelps v. Wichita Eagle–Beacon*, 886 F.2d 1262, 1267 (10th Cir.1989).[15] Plaintiffs allege that Black & Veatch interfered with their rights to make and enforce contracts.

Section 1982 deals with discrimination in property transactions.[16] It states:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

42 U.S.C. § 1982. Section 1982 was enacted to enable Congress to enforce the Thirteenth Amendment and, particularly, to prohibit all racial discrimination, private and public, in the sale and rental of property. *See Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir.1996) (citing *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 437, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968)). Both section 1981 and section 1982 derive their operative language from the first section of the Civil Rights Act of 1866. *See id.* Because of their common origin and purpose, section 1981 and section 1982 are generally construed in tandem. *See id.* (citing *Tillman v. Wheaton–Haven Recreation Ass'n, Inc.*, 410 U.S. 431, 440, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973)).

For purposes of summary judgment, the parties agree that plaintiffs' claims are analyzed under the burden-shifting framework developed under Title VII in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1403 n. 3 (10th Cir.1997); *Brown v. American Honda Motor Co.*, 939 F.2d 946, 949

**15.** Although the *Phelps* decision was rendered prior to the 1991 amendments to § 1981, the portion of § 1981 from which the Circuit derived the principles set forth in *Phelps* remained unchanged after the amendments and

is set forth in subsection (a) of post-amendment § 1981.

**16.** The court questions whether section 1982 even applies to the facts presented here, but Black & Veatch has not raised this issue.

(11th Cir.1991) (*McDonnell Douglas* applied to alleged discrimination in contracting); *Chauhan v. M. Alfieri Co.*, 897 F.2d 123, 126–27 (3d Cir.1990) (same); *Asbury v. Brougham*, 866 F.2d 1276, 1279 (10th Cir.1989) (*McDonnell Douglas* applied to section 1982 claim for alleged discrimination in housing). Pursuant to this framework, plaintiffs initially must raise a genuine issue of material fact on each element of their prima facie case of discrimination. *See Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995). Once plaintiffs establish their prima facie case, the burden shifts to Black & Veatch to offer a legitimate, nondiscriminatory reason for its actions. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. 1817; *EEOC v. Flasher Co.*, 986 F.2d 1312, 1317–19 (10th Cir.1992)). If Black & Veatch comes forward with a nondiscriminatory reason for its actions, the burden then reverts to plaintiffs "to show that there is a genuine dispute of material fact as to whether the [defendant's] proffered reason for the challenged action is pretextual—i.e., unworthy of belief." *Id.* (citing *Ingels v. Thiokol Corp.*, 42 F.3d 616, 622 (10th Cir.1994)). If plaintiffs proffer such evidence, the motion for summary judgment must be denied. *Id.*

## A. Plaintiffs' Prima Facie Case of Discrimination

■ Although the parties agree that use of the *McDonnell Douglas* framework is appropriate here, the parties disagree with respect to the specific elements of the first stage of that framework—plaintiffs' prima facie case. Black & Veatch urges that plaintiffs must show that (1) they are members of a racial minority; (2) Black & Veatch had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., the making and enforcing of a contract). *See*

*Morris v. Office Max, Inc.*, 89 F.3d 411, 413–14 (7th Cir.1996) (citing *Green v. State Bar of Texas*, 27 F.3d 1083, 1086 (5th Cir.1994)); *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1087 (2d Cir.1993). According to Black & Veatch, plaintiffs' claims fail at the prima facie stage because plaintiffs have not set forth any evidence with respect to the second element of their prima facie case (*i.e.*, that Black & Veatch had an intent to discriminate on the basis of race).

Plaintiffs, on the other hand, urge the court to apply the following prima facie elements: (1) that plaintiffs are members of a protected class; (2) that they attempted to contract for certain services; (3) that they were denied the right to contract for those services; and (4) that such services remained available to others outside the protected class. *See Jackson v. Montgomery*, 999 F.2d 547, 1993 WL 261876, at *3 (10th Cir.1993) (setting forth prima facie elements for claim of contract discrimination under section 1981); *Asbury*, 866 F.2d at 1279–80 (discussing elements of prima facie case for claim of housing discrimination under section 1982); *White v. Denny's Inc.*, 918 F.Supp. 1418, 1424 (D.Colo.1996). Plaintiffs argue that they have adequately established the elements of this prima facie case. According to Black & Veatch, this four-part prima facie test is inappropriate because plaintiffs have failed to show that any "similarly situated" individuals or entities received favorable treatment in connection with the KCITS project.

Construing the evidence in the light most favorable to plaintiffs, the court concludes that plaintiffs have satisfied their prima facie case under both of the prima facie tests set forth above. Thus, the court need not decide whether one of these tests represents the "correct" standard by which to measure plaintiffs' claims.[17] With respect to the second element of the prima

17. Presumably, both tests are correct and the application of one test over the other would depend on the particular factual context of a given case. *See Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1469 (10th Cir.1992) ("The

burden of establishing a prima facie case of discrimination ... is not onerous."); *Pitre v. Western Elec. Co.*, 843 F.2d 1262, 1265 (10th Cir.1988) (The prima facie burden "is satisfied by presenting a scenario that on its face

facie test set forth by Black & Veatch, the record contains facts from which a reasonable jury could conclude that Black & Veatch intentionally discriminated against Mr. Edwards on the basis of his race. These facts are discussed below in connection with the court's analysis of plaintiffs' pretext evidence. With respect to plaintiff's proffered prima facie test, plaintiff has set forth specific facts demonstrating that, despite the fact that plaintiffs were interested in playing what defendant depicted as a significant role in the KCITS project (20% of the total value of the project), Black & Veatch subsequently reduced plaintiffs' role in the project and submitted a proposed subconsultant agreement and prime agreement contemplating significantly less participation by plaintiffs. Those services that were retracted from plaintiffs, then, were thereafter assumed by non-minority firms. Contrary to defendant's suggestion, plaintiffs need not demonstrate that "similarly situated" non-minority firms assumed those services. Thus, for purposes of summary judgment, plaintiffs have established a prima facie case of discrimination.[18]

### B. Defendant's Legitimate, Nondiscriminatory Reason

■ Because plaintiffs have set forth sufficient facts establishing the elements of their prima facie case of discrimination, the burden shifts to Black & Veatch to produce evidence of a legitimate nondiscriminatory reason for the challenged conduct. According to Black & Veatch, it reduced plaintiffs participation in the project because it feared losing the project

itself if it did not reduce plaintiffs' participation. In support of this reason, Black & Veatch highlights the testimony of Mssrs. Mixon and Keith in which these project managers testified that MODOT officials instructed them to remove plaintiffs from the lead role in public involvement based on Mr. Edwards' presentation at the July 18, 1997 scoping meeting. Thus, according to Black & Veatch, the decision to remove plaintiffs from the lead role in public involvement was based on Mr. Edwards' "poor judgment, unprofessional behavior, and lack of qualifications as demonstrated at the July 18, 1997 scoping meeting." Black & Veatch has satisfied its "exceedingly light" burden to provide a nondiscriminatory reason for its actions. See Anaeme v. Diagnostek, Inc., 164 F.3d 1275, 1279 (10th Cir.), cert. denied, —— U.S. ——, 120 S.Ct. 50, 145 L.Ed.2d 44 (1999).

### C. Plaintiffs' Pretext Burden

■ To establish pretext, then, plaintiff must show either that "a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence." Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1317 (10th Cir.1999) (emphasis added) (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). In other words, in order to meet their pretext burden at the summary judgment stage, plaintiff need not come forward with evidence that defendant acted with an illegal discriminatory motive. See Randle v. City of Aurora, 69 F.3d 441, 451–52 (10th Cir.

suggests the defendant more likely than not discriminated against the plaintiff."). See also Greene v. Safeway Stores, Inc., 98 F.3d 554, 559–60 (10th Cir.1996) (plaintiff produced sufficient direct and circumstantial evidence of age discrimination to proceed to trial without relying on McDonnell Douglas scheme).

18. Black & Veatch also contends that, whatever the precise elements of plaintiffs' prima facie case, plaintiffs have still not satisfied the "general prima facie requirement" of presenting facts that give rise to an inference or

presumption of discrimination. However, the court has already concluded that plaintiffs have set forth facts establishing the elements of both "prima facie" tests set forth by the parties. These facts, then, create the presumption of discrimination. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (establishing the elements of a prima facie case creates a presumption of illegal discrimination because it eliminates the most likely legitimate explanations for the defendant's adverse action).

1995). Rather, for purposes of summary judgment, plaintiffs need only come forward with evidence that defendant's proffered reason is unworthy of credence. *See id.* at 451–53. Plaintiffs may accomplish this by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *See, e.g., Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (1999) (quoting *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997)). At trial, plaintiffs must convince the jury not only that the reason proffered by defendant is pretextual, but also that defendant's pretext concealed a discriminatory motive against plaintiffs in violation of the civil rights laws. *See Randle,* 69 F.3d at 453 n. 18.[19] It is this last inference which must be established at trial, but which is not required at the summary judgment stage. *Id.*

■ With these principles in mind, the court concludes that plaintiffs have come forward with sufficient evidence to survive summary judgment. According to defendant, plaintiffs' role in the project was reduced at the direction of MODOT officials Bill Yarnell and Patrick Walker based on Mr. Edwards' presentation at the July 18, 1997 scoping meeting. In fact, both Mr. Mixon and Mr. Keith testified that MODOT gave this specific instruction during a break in the course of the scoping meeting. There is evidence in the record, however, from which a reasonable jury could conclude that this proffered reason is unworthy of belief. Specifically, the testimony of both Mr. Yarnell and Mr. Walker casts significant doubt on defendant's proffered reason. Mr. Yarnell, for example, testified that he had no recollection of giving any direction to Black & Veatch about plaintiffs' participation in the project and that he did not believe he would have told Black & Veatch to remove plaintiffs

from the lead role on the public involvement program. According to Mr. Walker's testimony, no one involved in the July 18, 1997 conversation reached the conclusion that plaintiffs should be removed from their role in the public involvement program. Moreover, Mr. Walker testified that he had never heard anyone from MODOT tell Black & Veatch that they had to remove plaintiffs from the program or otherwise reduce plaintiffs' participation in the project. Such circumstances are sufficient to raise an inference of pretext. *See Corneveaux v. Cuna Mutual Ins. Group,* 76 F.3d 1498, 1503 (10th Cir.1996) (ADEA plaintiff produced sufficient evidence of pretext where defendant alleged that plaintiff had personality conflicts with different people, including the "current manager of a very large credit union," but the manager testified that he had not had any particular problems with plaintiff).

In sum, there is sufficient evidence in the record from which a reasonable jury could conclude that defendant's proffered reason for reducing plaintiffs level of participation in the KCITS project is pretextual. Whether plaintiffs ultimately can prove that Black & Veatch's actions were motivated by Mr. Edwards' race is a separate question, but one that need not be resolved on summary judgment. For purposes of defendant's motion, plaintiff has come forward with evidence that defendant's proffered reason for its actions is unworthy of belief. No more is required at this stage. Defendant's motion for summary judgment on plaintiffs' section 1981 and section 1982 claims is denied.

## IV. Plaintiffs' Title VI Claim

■ Plaintiffs also argue that Black & Veatch violated their right under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et al., to be free from intentional discrimination "under any program or activity receiving Federal financial assistance," see id. § 2000d. [20] In support of its

---

**19.** Of course, plaintiff could prove illegal discrimination at trial directly, as opposed to inferentially, by offering direct evidence of discrimination. *See Randle,* 69 F.3d at 453.

**20.** Although Title VI itself proscribes only intentional discrimination, certain regulations

motion for summary judgment on this claim, Black & Veatch simply incorporates by reference its arguments with respect to plaintiffs' section 1981 and section 1982 claims, namely that plaintiffs have failed to establish a prima facie case of discrimination and have failed to establish that defendant's legitimate nondiscriminatory reason for its action are pretextual. As set forth above, the court has rejected those arguments. In any event, the court has failed to uncover any authority suggesting that Title VI has a higher burden of proof than section 1981 and section 1982. Thus, the fact that plaintiffs have survived summary judgment on their section 1981 and section 1982 claims dictates that plaintiffs also survive summary judgment on their Title VI claim. Thus, defendant's motion for summary judgment on plaintiffs' Title VI claim is denied.

## V. Plaintiffs' Section 1983 Claim

In the pretrial order, plaintiffs assert that Black & Veatch acted under color of state law to deprive plaintiffs of their rights "under the Constitution and laws of the United States." In support of their claim, plaintiffs maintain that Black & Veatch agreed with MODOT officials to shift work from EAI to non-minority entities and solicited and received the district engineer's waiver of the DBE participation goal based on Black & Veatch's allegedly fraudulent representation that it had been unsuccessful in identifying a qualified DBE to perform meaningful work on the project. Black & Veatch contends that summary judgment on this claim is appropriate because plaintiffs have not set forth sufficient facts demonstrating that Black & Veatch either acted "under color of state law" or deprived plaintiffs of a federally protected right. As set forth below, the court agrees with Black & Veatch that plaintiffs have not come forward with sufficient facts from which a reasonable jury

could conclude that Black & Veatch acted under color of state law. Thus, the court grants defendant's motion for summary judgment on plaintiffs' section 1983 claim.

As the Supreme Court recently reiterated, section 1983 "basically seeks 'to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights' and to provide related relief." *See Richardson v. McKnight,* 521 U.S. 399, 403, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997) (quoting *Wyatt v. Cole,* 504 U.S. 158, 161, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992) (citing *Carey v. Piphus,* 435 U.S. 247, 254–257, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978))). It imposes liability only where a person acts "under color" of a state "statute, ordinance, regulation, custom, or usage." *Id.* (quoting 42 U.S.C. § 1983). Nonetheless, section 1983 can sometimes impose liability upon a private individual or entity under certain narrowly prescribed circumstances. *Id.* (citing *Wyatt,* 504 U.S. at 162, 112 S.Ct. 1827; *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 924, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)).

■■■ It is uncontroverted that Black & Veatch is a private actor for purposes of analyzing plaintiffs' section 1983 claim. In order to hold a private actor liable under section 1983, "it must be shown that the private person was jointly engaged with state officials in the challenged action, or has obtained significant aid from state officials, or that the private individual's conduct is in some other way chargeable to the State." *Pino v. Higgs,* 75 F.3d 1461, 1465 (10th Cir.1996) (quoting *Lee v. Town of Estes Park,* 820 F.2d 1112, 1114 (10th Cir.1987)); *see also Gallagher v. Neil Young Freedom Concert,* 49 F.3d 1442, 1447 (10th Cir.1995) (identifying four tests for determining whether particular conduct constitutes state action). In their

---

promulgated pursuant to Title VI prohibit actions that have a disparate impact on groups protected by the act, even in the absence of discriminatory intent. *See Villanueva v. Carere,* 85 F.3d 481, 486 (10th Cir.1996) (citing

*Guardians Ass'n v. Civil Serv. Comm'n,* 463 U.S. 582, 584 n. 2, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983)). Plaintiffs do not assert a disparate impact claim here.

response to defendant's motion for summary judgment, plaintiffs submit that they are relying on the "joint action" test to establish defendant's liability under section 1983. *See Dennis v. Sparks*, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Under the "joint action" test, a section 1983 claim may arise when a private party acts "in concert" with (*i.e.*, conspires with) state officials in effecting a particular deprivation of constitutional rights. *See Anaya v. Crossroads Managed Care Systems, Inc.*, 195 F.3d 584, 596 (10th Cir.1999); *Gallagher*, 49 F.3d at 1453. Stated another way, the private party and state officials must "share a common, unconstitutional goal." *See Anaya*, 195 F.3d at 596 (quoting *Gallagher*, 49 F.3d at 1454 (quoting *Cunningham v. Southlake Ctr. for Mental Health, Inc.*, 924 F.2d 106, 107 (7th Cir. 1991))). The mere acquiescence of a state official in the actions of a private party is not sufficient. *See Gallagher*, 49 F.3d at 1453.

■ Plaintiffs have failed to come forward with facts tending to show that MODOT officials and Black & Veatch (through its agents Mssrs. Keith and Mixon) shared a specific goal to violate plaintiffs' constitutional rights by engaging in a particular course of action. *See Gallagher*, 49 F.3d at 1455. With respect to plaintiffs' argument that Black & Veatch agreed with MODOT officials to reduce plaintiffs' participation in the project, thereby shifting additional services to non-minority firms, the record before the court supports only two reasonable versions of events. The first version, based on the testimony of Mssrs. Mixon and Keith, is that Black & Veatch reluctantly reduced plaintiffs' participation in the project only at the direction of MODOT. In that regard, Mr. Keith testified that he thought it was "unfair" to remove plaintiffs from the lead role based solely on Mr. Edwards' presentation at the scoping meeting. Moreover, Mr. Mixon was not present during Mr. Edwards' remarks at the scoping meeting. The second version, based on the testimo-

ny of Mssrs. Yarnell and Walker, is that Black & Veatch (for whatever reason) decided to reduce plaintiffs' role in the project and that MODOT simply consented to that decision. Neither of these factual scenarios establishes the requisite degree of concerted action.

With respect to the decision by MODOT to waive the DBE participation goal, plaintiffs concede in their papers that this decision was based solely on defendant's certification to MODOT that Black & Veatch had made good faith efforts to locate another minority business for the project. According to plaintiffs, this fact permits two alternative inferences—either that both MODOT and defendant knew the certification was fraudulent or that defendant "improperly used" MODOT to obtain the waiver by misrepresenting its efforts to locate minority businesses. The first inference proposed by plaintiffs is simply not a reasonable one. There is no evidence in the record that MODOT had any knowledge that Black & Veatch did not make efforts to locate another minority business for the project. With respect to the second inference proposed by plaintiffs, such an inference, even if reasonable, demonstrates the antithesis of "concerted action."

In sum, there is no evidence in the record from which a jury could reasonably conclude that MODOT officials and Black & Veatch conspired to effect a particular deprivation of plaintiffs' constitutional rights. Accordingly, the joint action test is not satisfied and plaintiffs have failed to demonstrate the requisite "state action" for purposes of their section 1983 claim. *See Gallagher*, 49 F.3d at 1456. Summary judgment in favor of Black & Veatch is appropriate.

## VI. Plaintiffs' Section 1985 Claim

As described in the pretrial order, plaintiffs' section 1985 claim is based on the same facts as those set forth above in connection with plaintiffs' section 1983 claim. These facts, according to plaintiffs, demonstrate that Black & Veatch and MO-

DOT "coordinated their efforts in the treatment of EAI." In support of its motion, Black & Veatch contends that summary judgment is mandated in light of plaintiffs' failure to produce sufficient facts from which a reasonable jury could conclude that a conspiracy existed between Black & Veatch and any state officials. For the reasons set forth below, the court concludes that no reasonable jury could find that Black & Veatch conspired with any state officials.[21] Summary judgment in favor of Black & Veatch is granted.

■ Although § 1985(3) does not create any substantive rights, it provides a remedy when individuals conspire to deprive a member of a protected class of equal protection of the laws or equal privileges and immunities under the laws. *See Gallegos v. City & County of Denver*, 984 F.2d 358, 362 (10th Cir.1993) (citing *Dixon v. City of Lawton*, 898 F.2d 1443, 1448 (10th Cir.1990)). To prove a conspiracy in violation of § 1985(3), plaintiffs must show the existence of a conspiracy intended to deny them equal protection under the laws or equal privileges and immunities of the laws resulting in an injury or deprivation of federally protected rights, and an overt act in furtherance of the object of the conspiracy. *Murray v. City of Sapulpa*, 45 F.3d 1417, 1423 (10th Cir.1995) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102–03, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *Ward v. St. Anthony Hosp.*, 476 F.2d 671, 676 (10th Cir.1973)). Plaintiffs must also demonstrate that "some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267–68, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) (quoting *Griffin*, 403 U.S. at 102, 91 S.Ct. 1790).

■ In support of their section 1985(3) claim, plaintiffs have not raised any arguments other than those set forth in support of their section 1983 claim. Thus, in light of the court's conclusion that plaintiffs failed to set forth sufficient facts demonstrating a conspiracy for purposes of section 1983, it need not address any further issues as to section 1985. *See Gehl Group v. Koby*, 63 F.3d 1528, 1539 n. 16 (10th Cir.1995). Summary judgment in favor of Black & Veatch is granted on plaintiffs' section 1985 claim.

## VII. Plaintiffs' State Law Claims

Based on the facts set forth above, plaintiffs assert a variety of state law claims against Black & Veatch. Specifically, in the pretrial order, plaintiff sets forth a fraud claim based on Mssrs. Mixon and Keith's allegedly false representations about plaintiffs "extensive" participation in the KCITS project; a breach-of-fiduciary-duty claim and a breach-of-contract claim based on, *inter alia*, defendant's decision to reduce plaintiffs' participation in the KCITS project; and a defamation claim based on language found in the prime agreement concerning Black & Veatch's inability to find a "qualified" DBE in the light of the "technical complexity" of the public involvement portion of the project and the need for "highly specialized expertise" in that area. Black & Veatch moves for summary judgment on each of these claims. As set forth below, the court grants Black & Veatch's motion with respect to plaintiffs' fraud and fiduciary duty claims and denies the motion with respect to plaintiffs' breach-of-contract and defamation claims.

### A. Fraud

In its motion, Black & Veatch maintains that summary judgment is appropriate because plaintiffs have not established that Black & Veatch knowingly made untrue statements and, even assuming such statements were made, that plaintiffs have not

---

21. Defendant also moves for summary judgment on this claim on the grounds that plaintiffs have not presented any facts demonstrating the deprivation of any constitutional right or the existence of any "invidi-

ously discriminatory animus." In light of the court's conclusion that plaintiffs have failed to offer sufficient evidence of a conspiracy, the court declines to address defendant's additional arguments.

established that those statements were made with the intent to deceive (or recklessly made with disregard for the truth) and that plaintiffs justifiably relied on them. Plaintiffs have failed to respond to these arguments in their papers and, in fact, have not addressed whatsoever the merits of their fraud claim. In similar circumstances, several of the judges for this district, including the undersigned, have deemed such claims abandoned. *See, e.g., Tufts v. Newmar Corp.,* 53 F.Supp.2d 1171, 1181 n. 12 (D.Kan.1999) (Vratil, J.); *Wesley v. Don Stein Buick, Inc.,* 42 F.Supp.2d 1192, 1195 n. 2 (D.Kan.1999) (Lungstrum, J.); *Poore v. Rooks County,* 34 F.Supp.2d 1275, 1278–79 (D.Kan.1999) (Marten, J.). Moreover, Black & Veatch raised this "abandonment" theory in its reply to plaintiffs' papers and plaintiffs have remained silent. In light of these circumstances, and because the court is not inclined to create arguments on plaintiffs' behalf in response to the points set forth by Black & Veatch in its motion, the court deems plaintiffs' fraud claim abandoned. Summary judgment in favor of Black & Veatch on this claim is granted.

### B. Breach of Fiduciary Duty

Plaintiffs also claim that a fiduciary relationship existed between EAI and Black & Veatch such that Black & Veatch had a duty to act in good faith and with due regard to the interests of EAI. Plaintiffs maintain that Black & Veatch breached this duty by, among other things, reducing EAI's level of participation in the project. In support of its motion for summary judgment, Black & Veatch contends that no fiduciary relationship ever existed between the parties and, even assuming such a relationship did exist, that plaintiffs cannot establish that Black & Veatch breached any duty owed to EAI. As set forth below, summary judgment in favor of Black & Veatch is warranted on plaintiffs' breach of fiduciary duty claim because plaintiffs have failed to set forth sufficient facts demonstrating that a fiduciary relationship existed between the parties.

A "fiduciary relationship" is any relationship of blood, business, friendship, or association in which one of the parties reposes special trust and confidence in the other who is in a position to have and exercise influence over the first party. *Brown v. Foulks,* 232 Kan. 424, 430–31, 657 P.2d 501 (1983). In general, Kansas law recognizes two types of fiduciary relationships: (1) those specifically created by contract, such as principal/agent, attorney/client, and trustee cestui que trust, and those created by formal legal proceedings, such as guardian and/or conservator/ward, and executor/administrator of an estate; and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions. *Rajala v. Allied Corporation,* 919 F.2d 610, 614 (10th Cir.1990) (citing *Denison State Bank v. Madeira,* 230 Kan. 684, 691, 640 P.2d 1235 (1982)). Plaintiffs maintain that a fiduciary relationship was implied in law (the second category of fiduciary relationship recognized by Kansas law) due to the particular circumstances presented here.

In *Denison State Bank v. Madeira,* the Kansas Supreme Court specifically detailed the factors courts should consider in determining whether the second type of fiduciary relationship exists:

> A fiduciary relationship imparts a position of *peculiar confidence placed by one individual in another.* A fiduciary is a person with a duty *to act primarily for the benefit of another.* A fiduciary is in a position to have and exercise, and does *have and exercise influence over another.* A fiduciary relationship implies a condition of *superiority of one of the parties over the other.* Generally, in a fiduciary relationship, the property, interest or authority of the other is *placed in the charge of the fiduciary.*

230 Kan. at 691, 640 P.2d 1235 (emphasis in original). The court in *Denison* made clear that each of the general considerations listed above need not be present in

every case in which a fiduciary relationship is alleged. *Rajala,* 919 F.2d at 614. The court emphasized, however, that "one may not abandon all caution and responsibility for his own protection and unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary." *See Denison,* 230 Kan. at 696, 640 P.2d 1235. This is particularly true when the party attempting to impose the fiduciary relationship on another is "fully competent and able to protect his own interests." *See id.*

In *Paul v. North,* 191 Kan. 163, 380 P.2d 421 (1963), the Kansas Supreme Court recognized that although a fiduciary relationship may arise out of an agreement to act together for the mutual benefit of the parties, such a relationship cannot be established by accident or inadvertence. *See id.* at 170, 380 P.2d 421. The court continued:

> Mere concert of action, without more, does not establish a fiduciary relationship. Undoubtedly, parties may deal at arm's length for their mutual profit. It is only when, by their concerted action, they willingly and knowingly act for one another in a manner to impose mutual trust and confidence that a fiduciary relationship arises.

*See id.*

The court also finds the Tenth Circuit's decision in *Rajala* relevant to an analysis of plaintiffs' claim. There, the plaintiff, a manufacturer of plastic films, sued a chemical company engaged in the production of resin products used in making plastic film. *Rajala,* 919 F.2d at 613. The plaintiff asserted a cause of action for, *inter alia,* breach of fiduciary duty. *Id.* The district court allowed this claim to proceed to trial. *Id.* The jury returned a verdict in favor of plaintiff, whereupon defendant moved for judgment notwithstanding the verdict. *Id.* The district court denied the motion. *Id.*

On appeal, the Tenth Circuit reversed the district court's denial of the motion, concluding that the evidence was insufficient to establish a fiduciary rela-

tionship between the parties. *See id.* at 616–23. In reaching its decision, the Tenth Circuit emphasized that there was no evidence that the defendant had ever consciously assumed the duties of a fiduciary. *See id.* at 623. The court further noted that although the evidence at trial demonstrated that defendant had intended to act in a manner which would have consequential benefits for plaintiff, nothing in the record suggested that any authorized representative of defendant ever intended to assume fiduciary duties on behalf of plaintiff. *See id.* No evidence demonstrated that defendant was acting "primarily for the benefit of" the plaintiff. *See id.* at 624. In addition, although the "parties did place confidence in each other," that confidence was based on "commercial self-interest in which both parties had the power contractually to protect their own interests however they chose." *See id.*

Here, as in *Rajala,* the record is devoid of any evidence that any Black & Veatch agent consciously or deliberately assumed the responsibilities of a fiduciary in Black & Veatch's dealings with plaintiffs. Nor do the undisputed facts reveal that Black & Veatch acted, or agreed to act, for plaintiffs' direct and primary benefit. In sum, the court concludes that plaintiffs have failed to meet their burden of showing that a fiduciary relationship existed between the parties. Accordingly, summary judgment is granted in favor of Black & Veatch on this claim.

## C. Breach of Contract

According to plaintiffs, the parties here entered into an oral contract whereby Black & Veatch offered to set aside 20% of the KCITS project in exchange for EAI's commitment to join Black & Veatch's project team. Plaintiffs claim that Black & Veatch breached the contract by failing to allocate 20% of the project's worth to plaintiffs. Black & Veatch contends that no contract existed between the parties and, to the extent one did exist, it is unenforceable because it is too indefinite and it

falls within the statute of frauds. As set forth below, the court concludes that genuine issues of material exist with respect to whether a contract existed between the parties. Moreover, to the extent the contract described by plaintiffs did exist, the contract is not too indefinite and does not fall within the statute of frauds. Defendant's motion for summary judgment on plaintiffs' contract claim is denied.

■ As an initial matter, Black & Veatch maintains that the record is devoid of any facts demonstrating the existence of an oral contract. The court disagrees. The affidavit submitted by Mr. Edwards sufficiently supports the contract alleged by plaintiffs. In essence, Mr. Edwards avers that Mr. Keith specifically promised that if plaintiffs agreed to join the project team, then plaintiffs' participation in the project would be "double" the ten percent DBE goal for the project. Mr. Edwards also avers that he emphasized to Mssrs. Keith and Mixon that he would join the project team only if Black & Veatch "agreed" that EAI would have substantial and significant participation in the project. In light of Mr. Edwards' testimony, whether a contract existed between the parties is a question of fact.

■ Black & Veatch next argues that the alleged contract, assuming one exists, is too indefinite to be enforceable. *See Mohr v. State Bank of Stanley,* 244 Kan. 555, 572–73, 770 P.2d 466 (1989) (purported contract is unenforceable when it is so vague and indefinite that the intentions of the parties cannot be ascertained). Again, the court disagrees. As the Kansas Supreme Court has held:

> As a general rule, in order for a written agreement to be binding it must be sufficiently definite in its terms and requirements as to enable a court to determine what acts are to be performed and when performance is complete.... Where a purported contract is so vague and indefinite that the intention of the parties cannot be ascertained therefrom it is unenforceable; but absolute certainty is not required—only reasonable cer-

tainty is necessary. A contract may contain some formal imperfections or be lacking in detail, but it will not fail for uncertainty if the court can ascertain the terms and conditions by which the parties intended to be bound, and thus carry their intentions into effect.

*See Holley v. Allen Drilling Co.,* 241 Kan. 707, 710, 740 P.2d 1077 (1987) (quoting *Jack Richards Aircraft Sales, Inc. v. Vaughn,* 203 Kan. 967, 971, 457 P.2d 691 (1969)). The contract described by plaintiffs contemplates plaintiffs' participation in the team, including the team's efforts to obtain the KCITS project, in return for Black & Veatch's promise to allocate to plaintiffs 20% of the project's worth if the team was awarded the project. The terms of this alleged contract are reasonably certain such that the court can ascertain what acts are to be performed and when performance is complete. Summary judgment on this basis is denied. *See Holley,* 241 Kan. at 708, 711, 740 P.2d 1077 (purported oral contract whereby plaintiff agreed to come back to work for oil drilling company in exchange for defendant's promise to give him "15% off the top of what the rig made" contained definite and certain terms despite ambiguous language; contract was enforceable); *Lessley v. Hardage,* 240 Kan. 72, 79–82, 727 P.2d 440 (1986) (purported oral contract whereby defendant promised plaintiff that 10% of equity or cash earned from company's ventures would be set aside for key employees was sufficiently definite and certain; contract was enforceable).

■ Finally, Black & Veatch claims that the alleged contract described by plaintiff is unenforceable under the statute of frauds, K.S.A. § 33–106, which requires a writing for contracts that cannot be performed within one year. K.S.A. § 33–106 provides in relevant part:

> Specific cases where writing required. No action shall be brought whereby to charge a party ... upon any agreement that is not to be performed within the space of one year from the making

thereof, unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person thereunto by him or her lawfully authorized in writing.

This provision covers only those contracts whose performance "cannot possibly" be completed within a year. *See Augusta Bank & Trust v. Broomfield,* 231 Kan. 52, 59, 643 P.2d 100 (1982). According to plaintiffs' evidence, Black & Veatch first approached plaintiffs sometime after August 1996, the time when the Departments of Transportation solicited bids for the KCITS project. Under the contract that plaintiffs describe, plaintiffs performed almost immediately by joining the Black & Veatch project team. In exchange, Black & Veatch allegedly promised to allocate 20% of the KCITS project to plaintiffs if the team secured the project. Nothing in the terms of the contract as alleged by plaintiffs indicates that Black & Veatch's performance of awarding 20% of the project could not possibly be completed within one year and, thus, the alleged contract is outside the statute of frauds. *See id.* at 59–60, 643 P.2d 100 (alleged oral contract to level land not unenforceable under statute of frauds despite the fact that contractor had taken a year to complete leveling of first 2,000 acres of land and stated that it would have taken him another year to level remaining acres; there was no evidence offered to show performance could not possibly have been completed within a year with more equipment and more personnel).

### D. Defamation

■ Plaintiffs' defamation claim is based on the waiver provision of the prime agreement which, according to plaintiffs, essentially states that plaintiffs are not qualified to lead the public involvement portion of the project. To establish a claim for defamation, plaintiffs must show that Black & Veatch, through its agents, communicated to a third party false and defamatory words and that such communi-

cation resulted in harm to plaintiffs' reputation. *See Luttrell v. United Tel. System, Inc.,* 9 Kan.App.2d 620, 620–21, 683 P.2d 1292 (1984). In support of its motion for summary judgment, Black & Veatch asserts that the communications at issue were qualifiedly privileged and, in any event, that plaintiffs cannot show injury to their reputations. As set forth below, the court concludes that Black & Veatch has waived the defense of qualified privilege and that genuine issues of material fact exist with respect to whether plaintiffs' reputations were injured as a result of defendant's alleged statements. Summary judgment on this claim is denied.

■ The qualified privilege is defense is an affirmative one, *Turner v. Halliburton Co.,* 240 Kan. 1,7–8, 722 P.2d 1106 (1986), and, as such, must be preserved in the answer to a complaint or, at the very least, in the pretrial order. *See* Fed. Civ. P. 8(c). Plaintiffs maintain that Black & Veatch failed to preserve this defense in the pretrial order. Although Black & Veatch did not specifically identify any affirmative defenses in the pretrial order, it incorporated by reference the affirmative defenses set forth in its answer to plaintiff's first amended complaint. According to Black & Veatch, it specifically raised the qualified privilege defense in its answer. The court disagrees.

Black & Veatch directs the court to an affirmative defense that states, "Black & Veatch is entitled to absolute and/or qualified or good faith immunity." This defense clearly speaks to plaintiffs' section 1983 and section 1985 claims. In fact, the defense immediately follows a paragraph in which Black & Veatch denies that it acted under color of state law and immediately precedes a paragraph in which Black & Veatch denies that it conspired with any other party. Moreover, the defense highlighted by Black & Veatch does not mention any "privilege" as contemplated under Kansas law concerning defamation. The court has reviewed the remaining defenses set forth in Black & Veatch's answer to

plaintiffs' first amended complaint and has found that the qualified privilege defense is simply not preserved. Accordingly, Black & Veatch has waived its right to assert qualified privilege as a defense to plaintiffs' defamation claim. *See* Fed. R.Civ.P. 16(e); *Tyler v. City of Manhattan,* 118 F.3d 1400, 1403 (10th Cir.1997) (citing *Hullman v. Board of Trustees,* 950 F.2d 665, 668 (10th Cir.1991)).

▆ The remaining issue before the court with respect to plaintiffs' defamation claim is whether plaintiffs have set forth sufficient facts demonstrating that their reputations were damaged by Black & Veatch's alleged statements. In support of their claim, plaintiffs rely primarily on the affidavit of Mr. Edwards. There, Mr. Edwards testifies that the waiver language in the prime agreement has been circulated among various persons, including representatives of MODOT, KDOT, the Federal Highway Administration and the Mid–America Regional Council. Mr. Edwards further avers that, since this circulation, there has been "a virtual absence in the inquiries and requests for EAI professional services in Kansas and Missouri from local firms that often contacted EAI in the past." Not surprisingly perhaps, Black & Veatch urges that these facts are insufficient to survive summary judgment because the facts fail to demonstrate any causal connection between plaintiffs' alleged injuries and the contract language.

In analyzing this argument, the court finds the Kansas Supreme Court's recent decision in *Moran v. State of Kansas,* 267 Kan. 583, 985 P.2d 127 (1999), particularly instructive. In *Moran,* the plaintiff, a former head of the Department of Cardiothoracic Surgery at the University of Kansas Medical Center (KUMC), brought a defamation action against various University administrators alleging that these administrators made defamatory statements about him and his stewardship of KUMC's heart transplant program. *See Moran,* 267 Kan. at 583, 985 P.2d 127. The allegedly defamatory statements, made on four occasions over a two-week period, were published in

the Kansas City Star newspaper and/or posted on the Internet. *Id.* at 584, 985 P.2d 127.

The defendants in *Moran* moved for summary judgment on the plaintiff's claim on the ground that the plaintiff had produced no evidence that he suffered damages to his reputation as a result of defendants' statements. *See id.* at 583, 985 P.2d 127. In response to the defendants' motion, the plaintiff offered evidence in the form of interrogatory answers to the effect that, since the statements were published, he had been approached less frequently about a variety of issues, including considering new employment positions with existing transplant programs; developing new transplant programs; and writing or reviewing scholarly articles for national journals. *See id.* at 586, 985 P.2d 127. The district court granted the defendants' motion for summary judgment, stating that "[e]ven if the court gives plaintiff the benefit of these facts based solely on plaintiff's opinion and finds that all of these things have occurred, there is still no evidence that any of defendants' statements caused these results." *See id.* at 588, 985 P.2d 127. The district court elaborated that the "jury would have nothing but speculation before it on the question of whether it was defendants' statements ... that caused any of plaintiff's alleged damages." *See id.* at 589, 985 P.2d 127.

On appeal, the Kansas Supreme Court acknowledged that the evidence presented by plaintiff was "unquestionably thin." *See id.* at 590, 985 P.2d 127. Nonetheless, the court reversed the district court's grant of summary judgment. *See id.* at 593, 985 P.2d 127. The court reasoned that a noticeable decrease in "requests for the plaintiff's professional participation" after publication of the defendants' statements "would seem to be the sort of detrimental consequence that might be expected from colleagues' defamatory statements about his professional conduct." *See id.* at 590–91, 985 P.2d 127. Thus, according to the court, "it would be reasonable to infer

a causal link between the decreased demand for [the plaintiff's] professional participation and the defendants' statements." *See id.* at 591, 985 P.2d 127.

In light of the *Moran* decision, the court concludes that plaintiffs evidence, although weak, is sufficient to survive defendant's motion for summary judgment. Based on Mr. Edwards' testimony regarding a "virtual absence" of requests for EAI's professional services since the publication of defendant's allegedly defamatory statements, a jury could reasonably conclude that the absence of requests was as result of those statements. *See id.* Summary judgment is denied.[22]

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. # 51) is **granted in part and denied in part.** Defendant's motion is **granted** with respect to plaintiffs' section 1983, section 1985, fraud and breach-of-fiduciary-duty claims. These claims are dismissed. Defendant's motion is **denied** with respect to plaintiffs' section 1981, section 1982, section 2000d (Title VI), breach-of-contract and defamation claims.

**IT IS FURTHER ORDERED THAT** the parties attempt to resolve this matter before trial. In that regard, defendant's counsel shall contact the office of **Magistrate Judge David J. Waxse** on or before **Friday, January 14, 2000** to schedule a date and time for a settlement conference. **Trial is set to commence February 15, 2000 at 10:30 a.m.**

**IT IS SO ORDERED.**

---

22. Mr. Edwards also averred that he received an offer to participate in a significant project but that, after the waiver language was made known to the offeror, the offer was withdrawn. Mr. Edwards, however, was the person who notified the offeror of the nature and contents of the waiver language. In such circumstances, the court questions whether this evidence would be admissible at trial with respect to plaintiffs' defamation claim. *See Munsell v. Ideal Food Stores,* 208 Kan. 909, 920, 494 P.2d 1063 (1972) (a plaintiff cannot recover for defamation where the defamation is deemed to be the result of his own voluntary act).